United States District Court
for the
Southern District of Florida

| | |
|---|---|
| Brandy Varner and others,<br>Plaintiffs,<br><br>v.<br><br>Dometic Corporation, Defendant. | )<br>)<br>)<br>) Civil Action No. 16-22482-Civ-Scola<br>)<br>)<br>) |

### **Order on Motion for Reconsideration**

This matter is before the Court on the Plaintiffs' motion for reconsideration of the Court's Order on the Defendant's Motion for Summary Judgment and the Plaintiffs' Motion for Class Certification (the "Order"), which dismissed this case for lack of standing. The decision to grant or deny a motion for reconsideration is committed to the district court's sound discretion. *See Chapman v. AI Transport*, 229 F.3d 1012, 1023-24 (11th Cir. 2000) (reviewing reconsideration decision for abuse of discretion). Reconsideration is appropriate only in very limited circumstances, such as where "the Court has patently misunderstood a party, where there is an intervening change in controlling law or the facts of a case, or where there is manifest injustice." *See Vila v. Padron*, No. 04-20520, 2005 WL 6104075, at *1 (S.D. Fla. Mar. 31, 2005) (Altonaga, J.). "Such problems rarely arise and the motion to reconsider should be equally rare." *See id.* (citation omitted). In order to merit reconsideration, "the party must do more than simply restate its previous arguments, and any arguments the party failed to raise in the earlier motion will be deemed waived." *See id.*

The Plaintiffs argue that reconsideration is warranted because the Court erred in ruling that the Plaintiffs do not have standing to pursue their claims. (Mot. at 5.) The Court concluded that the Plaintiffs did not have standing because they "failed to adequately support their allegations that there is an inherent defect that is manifest in all Dometic cooling units and that they have suffered economic harm as a result of the defect." (Order at 13, ECF No. 219.) The Plaintiffs argue that the Court's conclusion that they had not established that there was an inherent defect in Dometic's cooling units was "based on a flawed premise." (Mot. at 2.) The flawed premise was the Court's description of the inherent defect as stress cracking and corrosion. (*Id.*) Rather, the Plaintiffs argue that the defect that they alleged was "the *design* of the boiler tube assemblies in all of Dometic's cooling units," and that "stress cracking and corrosion are the 'failure mode' that *results* from the defect." (*Id.*) (emphasis in

original.) The Plaintiffs describe the defective design as "Dometic's use of thin-walled, plain carbon steel tubing; a cooling solution made of highly corrosive ammonia and water; a particular weld geometry to join the boiler tube to the heater pocket; and a corrosion inhibitor, sodium chromate, that is rendered ineffective through the ordinary operation of the cooling unit." (*Id.*) The Plaintiffs argue that this defective design is present in all Dometic cooling units at the time of purchase. (*Id.*)

In the Order, the Court noted that it was "difficult to discern from the Complaint precisely what the Plaintiffs allege the inherent defect to be." (Order at 6.) Since the Plaintiffs primarily relied on the opinion of their expert, Dr. Paul Eason, to substantiate their allegations of an inherent defect, the Court utilized Dr. Eason's expert report to try to determine the nature of the alleged defect and whether it was manifest in all units at the time of sale. (*Id.* at 6-9.)

As the Court noted in the Order, Dr. Eason opined that Dometic's cooling units:

> [E]xhibit a common failure mode across all models that is demonstrative of a product defect. This failure manifests as a breach of the boiler tube and the release of the noxious, flammable contents. The release of flammable materials in the presence of a competent ignition source renders this failure mode a fire risk. This defect is a product of both the design and manufacture of the unit, specifically the materials selection of steel tubing for the boiler and the process of welding to join that tubing to adjacent heat sources, in the operational presence of a highly corrosive working fluid.

(Eason Rep. ¶ 7(a), ECF No. 135-19.) This description of the defect does not support the Plaintiffs' current argument that the defect *is* the design of the boiler tube assembly. Rather, Dr. Eason used the terms "defect" and "failure mode" interchangeably and opined that the defect is a product of both the boiler tube design *and* the manufacturing process. Moreover, as the Court noted in the Order, Dr. Eason clarified during his deposition testimony that Dometic's cooling units are defective *because* they exhibit a common failure mode, and he acknowledged that not all Dometic cooling units will experience that failure mode. (Eason Dep. Tr. 178:13 – 179:21, ECF No. 153-2.)

This testimony is consistent with the analysis in Dr. Eason's expert report. The report states that "[t]he primary failure mode of the cooling unit loop requires a compromise in the integrity of the loop . . . Any breach of the tubing will result in the release of the ammonia solution working fluid." (Eason Rep. ¶ 15.) Dr. Eason did not opine that the design of the boiler tube assembly

automatically causes a compromise in the integrity of the closed loop, or that the conditions required to cause such a compromise are present at the time of purchase. Rather, he identified three "mechanisms" that can result in a breach of the closed loop. (*Id.* ¶ 15-18.)

The Court's Order analyzed Dr. Eason's opinions and deposition testimony concerning each of the three mechanisms and concluded that none of the mechanisms necessarily occurred as a result of the product's design or were manifest in the cooling units at the time of sale. (Order at 7-9.) Rather, the occurrence of the three mechanisms was dependent on factors such as variations in the welding process during the manufacture of the unit and whether the unit was used properly. (*Id.*) The Court specifically observed that Dr. Eason's "use of the term 'common failure mode' is not a synonym for 'inherent defect.' Rather, the term indicates that there are a variety of factors that may come together to result in a leak." (*Id.* at 9.) Therefore, the Court did not misunderstand the evidence presented by the Plaintiffs or rely on a "flawed premise" in analyzing whether the Plaintiffs had established that there was an inherent design defect manifest in all units at the time of sale.

The only additional evidence that the Plaintiffs have cited in their motion for reconsideration that could potentially support their allegation of a uniform design defect is a 2007 letter from an engineer to an insurance company that provided an analysis of a Dometic cooling unit that caused a fire in a motor home (ECF No. 204-65). The letter states that "[t]he defective design in the boiler tube which allowed the refrigerant to leak in the first place was the cause of this fire, in my opinion." (*Id.* at 10.) However, the phrase "defective design" appears to be a reference to one of Dometic's recall notices, which the engineer described earlier in his letter as stating that the refrigerators "had been known to develop cracks in the boiler tube which can allow the flammable refrigerant to escape." (*Id.* at 9.) There is no other description of the "design defect" in the letter. The fact that the refrigerators had been known to develop cracks in the boiler tube does not constitute evidence of a uniform design defect manifest at the time of sale, nor is such evidence contrary to the Order, which specifically stated that "[t]here is no question that the Plaintiffs have established that there is a risk that their refrigerators will develop leaks and/or fires." (Order at 10.).[1]

---

[1] The Court notes that the motion for reconsideration states that "Plaintiffs also submitted evidence that the engineering consultant EWI inspected and analyzed Dometic cooling units in 2004 and concluded that leaks in the units were the result of 'cracking adjacent to an attachment weld' that EWI believed to 'be a consequence of thermally induced cyclic stresses in conjunction with stress concentrations *caused by the weld geometry and the part design.*'" (Mot. at 9) (emphasis in original.) In support of this statement, the Plaintiffs cite to Exhibit 32 of their Statement of Facts, without identifying a particular page of that document. (*Id.*) However, Exhibit 32 does not contain the italicized language. Rather, the closest sentence that

In arguing that the Court erred in finding that they did not have standing, the Plaintiffs rely heavily on *In re Zurn Pex Plumbing Products Liability Litigation*, 644 F.3d 604 (8th Cir. 2011), which the Court analyzed at length in its Order. (Mot. at 9-10.) The *In re Zurn* Court noted that the plaintiffs did not allege that the brass fittings in the plumbing systems merely risked developing stress corrosion cracking; rather, they alleged that stress corrosion cracking "afflicts all of the fittings upon use, regardless of water conditions or installation practices," and that stress corrosion cracking was already manifest in all of the plumbing systems. 644 F.3d at 616. The plaintiffs supported these allegations with expert testimony since the case was at the class certification stage. *See id.* The Plaintiffs here argue that, just like the plaintiffs in *In re Zurn*, they have "alleged and shown that the processes of corrosion and cracking begin to afflict the boiler tube assembly upon first use, regardless of individual circumstances." (*Id.* at 10.) As detailed above, while the Plaintiffs did make such an allegation in the Second Amended Complaint, the evidence presented at the summary judgment stage did not support this allegation. As noted in the Order, the Plaintiffs were required to substantiate their allegations with affidavits or other evidence at the summary judgment stage. (Order at 2-3.)

Curiously, in their reply in support of their motion for reconsideration, the Plaintiffs argue that "the plaintiff need not demonstrate that the undesirable condition alleged will actually occur in every unit." (Reply at 4, ECF No. 235.) The Plaintiffs argue that they have standing because they have established that "the design defect present in every unit at the point of sale will . . . set in motion processes that created a *tendency* for the boiler tube assemblies to wear down; a tendency that was not disclosed to any class member, and which caused Plaintiffs to pay more for their Dometic refrigerators than they would had Dometic disclosed the design defect to consumers." (*Id.* at 7) (emphasis added.") This argument fails for several reasons. First, as set forth above, the Plaintiffs have not established that the design defect necessarily sets in motion the processes that cause the "failure mode." Second, this argument undermines the Plaintiffs' repeated assertions in the motion for reconsideration that they have met the *In re Zurn* standard by showing that "the processes of corrosion and cracking begin to afflict the boiler tube assembly upon first use," as well as their allegation in the Second Amended Complaint that the "inherent defect will cause inevitable leaks to manifest during the cooling unit's normal operation . . . ." (Second Am. Compl. ¶ 106, ECF No. 89.) Third, the Plaintiffs did not make this argument in their

---

the Court could locate states that "the cause of leaking was probably due to thermally induced cyclic stresses in conjunction with weld geometry stress concentrations." (EWI Report at 7, ECF No. 204-32.)

motion for reconsideration and, therefore, they have waived it. *See Spann v. Cobb Cnty. Pretrial Court Serv's Agency*, 206 Fed. Appx. 910, 911 fn.1 (11th Cir. 2006) (appellant waived argument by failing to raise it in her initial brief) (citing *United States v. Dicter*, 198 F.3d 1284, 1289 (11th Cir. 1999)).

Finally, none of the cases that the Plaintiffs cite in the reply hold that a plaintiff has standing where he or she has not established that there is an inherent defect manifest at the time of sale *and* has not established that he or she has suffered an economic harm. In the motion for reconsideration, the Plaintiffs argued that they do not need to establish an economic loss, and "need only allege and evidence that they did not get the benefit of their bargains with a defendant for standing to attach." (Mot. at 11.) Taking this argument together with the argument in the reply that the Plaintiffs do not need to demonstrate that there was a defect that was manifest at the time of sale, it essentially amounts to an argument that the Plaintiffs do not need to establish any injury at all. Such a position ignores that the "irreducible constitutional minimum of standing" requires an injury in fact. *See, Lujan v. Def.'s of Wildlife*, 504 U.S. 555, 560 (1992) (citations omitted).

The Court held that the Plaintiffs had not substantiated their allegations that they suffered a loss in value or overpaid for their units as a result of the alleged defect, and the Plaintiffs have not persuaded the Court that it should re-visit this conclusion. The Court simply fails to see how the Plaintiffs can establish an injury in fact when they have not provided evidence that there is a uniform design defect manifest at the time of sale *and* have not provided evidence that they have suffered any economic harm due to either the alleged defect or the "tendency" of the cooling units to develop fires and leaks.

The remaining arguments simply rehash arguments previously made or rely on evidence that the Plaintiffs failed to previously present to the Court. (*See* Mot. for Reconsideration, Ex.'s B & C, ECF Nos. 226-2, 226-3.) Accordingly, the Court **denies** the Plaintiffs' motion for reconsideration (**ECF No. 225**).

**Done and ordered** in chambers, at Miami, Florida, on October 20, 2017.

Robert N. Scola, Jr.
United States District Judge