UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:16-cv-22482-RNS

CATHERINE PAPASAN *et al.* and all
persons similarly situated,

    Plaintiffs,

v.

DOMETIC CORPORATION,

    Defendant.

_____/

**DEFENDANT DOMETIC CORP.'S EXPEDITED MOTION TO STRIKE
PLAINTIFFS' EXPERTS' IMPROPER "REBUTTAL" OPINIONS**

Pursuant to Federal Rule of Civil Procedure 37(c)(1), Defendant Dometic Corp. ("Dometic") hereby moves to strike certain improper opinions in the Federal Rule 26 Supplemental Rebuttal Report Orion P. Keifer and Peter D. Layson ("AEGI Rebuttal Report") (attached as Exhibit A) and the entirety of the Expert Rebuttal Report of Garrett Glasgow ("Glasgow Rebuttal Report") (attached as Exhibit B) (collectively, the "Improper Rebuttal Reports").[1] Dometic respectfully requests expedited treatment under Local Rule 7.1(d)(2).

**PRELIMINARY STATEMENT**

By rule, an expert's rebuttal report serves a limited purpose: "to contradict or rebut evidence on the same subject matter" as an opposing expert's report. Fed. R. Civ. P. 26(a)(2)(D)(ii). Under this rule, a rebuttal report may only address new evidence put forth by an opposing party's experts, which necessarily could not have been addressed in an opening report.

---

[1] Dometic's motion encompasses the following opinions in the Summary of Conclusions at pages 3-4 of the AEGI Rebuttal Report: opinions 1, 3, and 4 concerning the Baron report; opinions 3, 4, and 5 concerning the Gray report, and all of the King Origin and Cause Conclusions (along with the corresponding summaries of conclusions later in the report). As for the body of the report, Dometic's motion applies to second paragraph of page 7; the last paragraph of page 7 through the second paragraph of page 24; the third paragraph of page 26 through the second paragraph of page 28; and pages 30 through 45.

1

Thus, for example, Dometic does not challenge AEGI's right to opine in rebuttal about Dr. Amy Gray's testing demonstrating that the secondary burner housing effectively prevents the spread of fire or that a properly installed Dometic refrigerator cannot leak hazardous amounts of ammonia into the cabin of an RV. However, many other aspects of AEGI's Rebuttal Report—as well as the entirety of Dr. Glasgow's Rebuttal Report—do not constitute proper rebuttal. Instead, they are intended simply to bolster Plaintiffs' case in chief.

For instance, for the first time in rebuttal, AEGI opines that the King RV fire was caused by the Dometic refrigerator—an opinion that AEGI did not offer in its opening report despite conceding that they could have done so had Plaintiffs' counsel only asked. They also opine, for the time in rebuttal, that various weld-process improvements made to Dometic refrigerators have "little" effect on corrosion—an issue Plaintiffs raised in their case-in-chief and which was a central dispute in the *Varner* briefing. And, they appear to revise the theory of the defect on which they originally opined and testified to at deposition. These brand new opinions do not constitute "rebuttal," but rather are untimely new opinions that are improper under Rule 26.

Beyond offering brand new theories, both AEGI and Dr. Glasgow violate a second principle of rebuttal. In particular, they both try to bolster their initial opinions by responding to criticisms of their methodology—improperly providing "sur-rebuttal" argument. If Plaintiffs wish to challenge Dometic's experts' criticisms, the appropriate vehicle is through cross-examination—not by issuing sur-rebuttal reports after their experts have been deposed. Indeed, permitting such sur-rebuttal opinions would create a lopsided disclosure regime in which Plaintiffs' experts can respond to criticisms of their work but Dometic's experts cannot.

Plaintiffs' attempts to re-do and rehabilitate their initial expert reports are unjustified and prejudicial. An expert's opening report must contain a "*complete* statement of *all opinions*," together with the "basis and reasons for" those opinions. Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added). Instead of complying with this Rule, Plaintiffs' experts provided new opinions supporting Plaintiffs' case in chief and additional bases and reasons for their existing opinions— *after* they were deposed and just *one day* before Plaintiffs moved for class certification. Given the advanced stage of the case, Dometic does not have adequate time to re-depose these experts and marshal expert evidence in response. The only way to avoid prejudice to Dometic is to strike the Improper Rebuttal Reports.

**LEGAL STANDARD**

Although parties are permitted to serve rebuttal reports, the role of those reports is strictly limited. Rebuttal reports must "solely . . . contradict or rebut evidence on the same subject matter" as an opposing party's expert. Fed. R. Civ. P. 26(a)(2)(D)(ii). The opportunity to provide a rebuttal report does not displace the obligation, in an expert's opening report, to provide a "*complete* statement of *all* opinions" and the "basis and reasons" for those opinions. *See* Fed. R. Civ. P. 26(a)(2)(B)(i) (emphasis added). As courts have explained, a rebuttal report is not a plaintiff's "chance to re-do [an] opening expert report" or "offer testimony under the guise of 'rebuttal' only to provide additional evidence for his case in chief." *Timber Pines Plaza, LLC v. Kinsale Ins. Co.*, 192 F. Supp. 3d 1287, 1291 (M.D. Fla. 2016). Rather, rebuttal reports are proper only to rebut "new matter or new theories presented by the defendant's case-in-chief." *Crowley v. Chait*, 322 F. Supp. 2d 530, 550 (D.N.J. 2004).

Courts treat improper rebuttal testimony as an untimely disclosure subject to exclusion under Rule 37(c)(1). *E.g.*, *In re Trasylol Prods. Liab. Litig.*, 2010 WL 4065436, at *2 (S.D. Fla. Aug. 6, 2010). As a general matter, a party cannot rely on an untimely disclosure unless it can show that the discovery violation was harmless or substantially justified. *See* Fed. R. Civ. P. 37(c)(1). Improper rebuttal disclosures are almost inevitably harmful, given the late stage of a case at which they occur, after the opposing party has already provided responsive reports and, in this case, after depositions have occurred. *See In re Denture Cream Prods. Liab. Litig.*, 2012 WL 5199597, at *5 (S.D. Fla. Oct. 22, 2012) (explaining that "expert witness discovery rules are designed to allow both sides in a case to prepare their cases adequately and to prevent surprise"). Thus, when a party attempts to "advance new arguments through a 'rebuttal' report," the "overwhelming weight of authority is that preclusion is *required* and *mandatory* absent some unusual or extenuating circumstances." *Wreal, LLC v. Amazon.com, Inc.*, 2016 WL 8793317, at *3 (S.D. Fla. Jan. 7, 2016) (emphasis in original).

**ARGUMENT**

I.  **The AEGI Rebuttal Report Improperly Offers New Opinions on Issues Where Plaintiffs Bear the Burden of Proof.**

A rebuttal report is not the place for evidence that "logically belongs in the case-in-chief." *In re Trasylol*, 2010 WL 4065436, at *2 (prohibiting plaintiff from offering causation evidence in a rebuttal report). Federal courts in Florida and elsewhere have repeatedly excluded purported

3

rebuttal testimony that plugs holes or offers new theories to support plaintiffs' case in chief after defendants have served their expert reports. *Coward v. Forestar Realty, Inc.*, 282 F. Supp. 3d 1317, 1331 (N.D. Ga. 2017) (prohibiting "completely new opinions" in rebuttal); *Wreal, LLC*, 2016 WL 8793317, at *3 (precluding plaintiff from advancing new theory "for the first time in rebuttal expert testimony"); *People v. Kinder Morgan Energy Partners, L.P.*, 159 F. Supp. 3d 1182, 1193 (S.D. Cal. 2016) (striking proffered expert testimony as "not proper rebuttal" because it was "essential to proving the [plaintiff's] case-in-chief"); *PODS Enters., Inc. v. U-Haul Int'l, Inc.*, 2014 WL 12628662, at *2 (M.D. Fla. July 2, 2014) (striking portion of expert's rebuttal report that "g[a]ve an opinion . . . that he failed to render in his initial report"); *Waste Servs. Inc. v. v. Waste Mgmt. Inc.*, 2006 WL 5109230, at *1 (M.D. Fla. Dec. 1, 2006) (excluding causation opinion on which the plaintiff "bears the burden of proof," making the opinion "not true rebuttal evidence"). Four opinions in the AEGI Rebuttal Report violate this rule.

    **A.  *The New King Origin-and-Cause Opinion.*** AEGI offers in rebuttal an "origin and cause" opinion that "the most probable source of ignition for the King RV fire is the failure of the Dometic absorption refrigerator boiler." AEGI Rebuttal Report at 32. AEGI explains the analysis of fire patterns and electrical evidence that led to that conclusion, and it also explains why, in its view, a rupture in the condenser is consistent with the fire having started much lower in the cooling unit, at the boiler tube. *Id.* at 31-45. Without question, this causation opinion is intended to support Plaintiffs' case in chief that the King RV fire was caused by a Dometic refrigerator. Causation opinions that "support [a plaintiff's] case-in-chief" are quintessentially the type that are "not proper rebuttal testimony" and that courts therefore routinely strike. *E.g.*, *In re Trasylol*, 2010 WL 4065436, at *2; *Waste Servs.*, 2006 WL 5109230, at *1.

    Plaintiffs cannot show "unusual or extenuating circumstances" to avoid that result here. *See Wreal, LLC*, 2016 WL 8793317, at *3. Mr. Layson admitted during his deposition earlier this month that he did not "[g]enerate a specific report" addressing causation of the King's RV fire because he "was not asked to." Deposition of Peter Layson ("Layson Dep.") 165:24-166:9 (excerpts attached as Exhibit C). Mr. Layson also made clear that he "[a]bsolutely" could have generated such a report "prior to January 4," Plaintiffs' deadline to disclose expert reports, if only Plaintiffs' counsel had asked. *Id*. at 166:4-9. Certainly, Plaintiffs' inexplicable failure to ask AEGI to prepare a report on the central issue of causation cannot justify their after-the-fact introduction of a causation opinion via a rebuttal report.

4

**B. The New High Rupture Theory.** AEGI asserts that "fish-mouth ruptures" located high in the cooling unit can be "caused by fires that originate at the boiler." AEGI Rebuttal Report at 20-21. This opinion is relevant to whether a particular RV fire was caused by a fire originating at the refrigerator's boiler tube—including many of the fires observed in the Plaintiffs' RVs—yet it was not included in AEGI's opening report. Again, causation opinions are not appropriately contained in rebuttal reports. *See supra* p. 4. Moreover, AEGI can hardly say that it was unforeseeable that Dometic's experts would opine otherwise, nor is there any excuse for AEGI not to have disclosed this opinion sooner. According to Mr. Layson, the opinion that a rupture high in a cooling unit indicates that the fire originated somewhere other than the boiler tube has been widely held since the "infancy of absorption refrigeration investigations" in approximately 2000—that is, nineteen years ago. Layson Dep. 32:7-14, 35:7-15. Nor is Mr. Layson's disagreement with this opinion anything new. He has disagreed since 2006 or 2008—more than a decade ago. Layson Dep. 35:23-36:11. As with the King origin-and-cause opinion, there is no reason that this causation-related opinion could not have been offered in AEGI's opening report. The opinion is untimely and should be stricken.

**C. The New Weld-Process Improvements Opinion.** For the first time in rebuttal, AEGI addresses the weld-process improvements to Dometic refrigerators in 2006 and 2007, opining that they would have done "little" to reduce "excessive and damaging corrosion" occurring inside the boiler tube. AEGI Rebuttal Report at 8-9. This opinion belatedly supports Plaintiffs' efforts to show a common defect in support of class certification and must be excluded.

For starters, Plaintiffs expressly alleged in their case-in-chief that the 2006 updates made to Dometic's welding procedures did not remedy the alleged defect and that the "process at play [is] unchanged." Consolidated Complaint ¶ 255 (ECF No. 300). Thus, AEGI's newly disclosed opinions intended to bolster this central allegation plainly constitute improper rebuttal opinion. *In re Trasylol*, 2010 WL 4065436, at *2 (striking plaintiff's expert's purported rebuttal opinion that went to a "central issue" because it "logically belong[ed] in the case-in-chief").

Furthermore, when a plaintiff "knows that the defendant means to contest" an issue on which the plaintiff bears the burden, the plaintiff "must put in his evidence on the issue" in the opening report, not sandbag the opposing party in rebuttal. *Timber Pines Plaza*, 192 F. Supp. 3d at 1291; *see also In re Trasylol*, 2010 WL 4065436, at *2 (excluding rebuttal opinion that "appears to support Plaintiff's case-in-chief" because it was "not proper rebuttal testimony"). Plaintiffs bear

5

the burden of showing that a class should be certified, and courts "routinely" hold that "differences amongst various models [are] fatal to class certification." *Harris v. Nortek Global HVAC LLC*, 2016 WL 4543108, at *3, *14 (S.D. Fla. Jan. 29, 2016).[2] That Dometic would highlight the welding changes made over the class period can be no surprise to Plaintiffs. Not only is the commonality hurdle settled law, but Dometic's argument that these changes "materially impact the propensity for corrosion and cracking at the boiler tube" was a centerpiece of Dometic's class-certification opposition in *Varner*. ECF No. 150, at 7-9.

AEGI's newly disclosed opinion is prejudicial not just because it late, but also because it contradicts the prior testimony of both Messrs. Layson and Keifer in this case. When asked why he and Mr. Keifer had opined in 2008 that it was "important" to inspect the welds on a gas absorption refrigerator believed to have leaked, Mr. Layson explained that "weld defects . . . can cause and contribute to irregularities with heat flux and heat transfer, as well as . . . thermal transfer"—factors that he admitted "*can cause accelerated corrosion*." Layson Dep. 117:11-21 (emphasis added). That was Mr. Layson's opinion March 1, less than two weeks before the AEGI Rebuttal Report was served. Mr. Keifer similarly acknowledged that "a poorly done weld . . . would be more susceptible to corrosion than one where the weld was done properly." Deposition of Orion Keifer ("Keifer Dep.") 111:19-23 (excerpts attached as Exhibit D); *see also id.* at 114:22-115:1 (agreeing that "an irregular weld can also disrupt or modify the grain structure" and thereby "accelerate corrosion"); *Id.* at 17:11-14 ("[W]ould you agree that . . . . irregularities or anomalies in the welding could contribute to corrosion? A. Yes."). Mr. Keifer further conceded that a properly adjusted automatic weld—the result of Dometic's weld-process changes—would be less subject to the kinds of irregularities that can affect manual welds and therefore less prone to the kind of heat-transfer issues that can lead to corrosion. *Id.* at 17:15-18, 113:3-25.

AEGI cannot simply add a new opinion essential to both Plaintiffs' case-in-chief and to class certification on the eve of their class-certification motion—after Messrs. Keifer and Layson gave conflicting opinions in their depositions, after Dometic disclosed its expert reports, and less than a month before Dometic's deadline to oppose class certification. Rule 26's expert-disclosure regime exists to "prevent surprise" so that "both sides in a case [can] prepare their cases

---

[2] The *Harris* court denied class certification after concluding that design differences among HVAC units in a class "may impact the propagation and risk of . . . corrosion," leaving plaintiffs unable to "demonstrate a design common to the proposed class." *Id.* at *14.

adequately." *In re Denture Cream*, 2012 WL 5199597, at *5. Plaintiffs' tactics undermine this regime and severely prejudice Dometic. Again, this new, central opinion supporting Plaintiffs' burden must be excluded.

**D.  The New Defect Theory.**  AEGI also uses its rebuttal report to change its theory of the defect. Like the new weld-process improvements opinion, the new defect opinion is an untimely and prejudicial attempt to salvage Plaintiffs' case-in-chief and attempts at class certification.

In *Varner*, this Court held that the plaintiffs lacked standing because they failed to show an "inherent defect that is already manifest in each cooling unit." ECF No. 219, at 5. In reaching this conclusion, the Court relied on the *Varner* plaintiffs' own expert, who had testified that corrosion does not occur in all cooling units and is not "inevitable during the normal operation of the cooling unit." *Id*. at 7-8. Standing is a fundamental issue not only to the merits, but also to class certification. *Denney v. Deutsche Bank* AG, 443 F.3d 253, 264 (2d Cir. 2006) ("No class may be certified that contains members lacking Article III standing."). In an attempt to overcome this fundamental issue, AEGI opined that the design of the Dometic cooling units is defective because it causes "excess corrosion." AEGI Report at 22 (excerpts attached as Exhibit E); *see also* Keifer Dep. 83:21-84:9 (confirming "excess corrosion" as the theory of the defect). Mr. Keifer defined excess corrosion as that which "extends into the tube appreciably and starts thinning the tube . . . deteriorating the wall." Keifer Dep. 84:3-85:13. However—critically—Mr. Keifer repeatedly distinguished between this type of damaging corrosion, and the initial formation of the "*desirable*" passive corrosion layer, which "protects the tube." Keifer Dep. 15:7-16:8; *see also id*. at 84:3-18 (distinguishing between initial passive corrosion layer and "excess corrosion, which is corrosion that extends "beyond the passive layer"); *id*. at 91:4-7 ("So I'm trying to draw the distinction between forming and keeping the passive layer and protecting the passive layer and continuing to breach the passive layer and damaging the underlying tube"); *see also* Layson Dep. 178:15-179:25 (explaining that the initial passive layer is desirable and is "not at all" something that Dometic should eliminate). When asked if damage to the protective layer would occur upon first use, Mr. Keifer speculated that he would be "surprised if they didn't" and that he "think[s] that's very likely." Keifer Dep. at 103:6-17.

To test this speculation, Dometic's expert Dr. Richard Baron subjected a new refrigerator to 24 hours of use and examined the boiler tube. Dr. Baron found "[n]o evidence of any damage to the protective layer" and that "the boiler tube wall was completely intact, with no thinning or

7

pitting observed." Baron Report at 15 (excerpt attached as Exhibit F). Having observed a used Dometic cooling unit with no cracking or other corrosion-induced damage upon first use, Dr. Baron concluded that "Dometic cooling units will not all exhibit a defect that damages the protective layer of the boiler tube upon first use." *Id.*

In an apparent attempt to overcome this testing, Plaintiffs use AEGI's Rebuttal Report to shift their theory of the defect. In particular, AEGI posits that the testing shows a "preferential oxide layer on the inside diameter of the boiler tube"—which purportedly "confirms AEGI's opinion that the common design of Dometic gas absorption refrigerator cooling unit boiler tube assemblies cause damage and the buildup of excessive corrosion beginning upon first use." AEGI Rebuttal Report at 7. But AEGI's opinion in its opening report was *not* that this preferential oxide layer—*i.e.*, the protective passive layer—is defective or damaging. Indeed, as discussed above, they testified to the precise opposite at deposition. Rather, their opinion was that the design is defective because it causes "excessive corrosion," which they defined as *damage* to the protective layer. Yet, AEGI's rebuttal report now apparently characterizes the "desirable" protective layer as indicative of a defect and evidence of "excessive corrosion" upon first use. This is a fundamental change to Plaintiffs' theory of the case on the eve of class certification.

Rebuttal reports are not an opportunity to change horses in midstream when the plaintiff's first theory does not pan out, and courts have repeatedly rejected this tactic. *See, e.g.*, *Foster v. USIC Locating Servs, LLC*, 2018 WL 4003354, at *2 (D. Kan. Aug. 17, 2018) (plaintiff cannot offer "new theory" when need to do so results from "fail[ure] to prepare" for points that defendant would offer in response to initial theory); *Intellectual Ventures I LLC v. AT&T Mobility LLC*, 2017 WL 478565, at *4 (D. Del. Jan. 31, 2017) (prohibiting new damages theory offered in response to defense expert's challenge to previous damages theory); *Congressional Air, Ltd. v. Beech Aircraft Corp.*, 176 F.R.D. 513, 517 (D. Md. 1997) (refusing to "to allow a new theory of liability in the eleventh hour" offered in rebuttal). This Court should do the same.

**II.      Plaintiffs' Rebuttal Reports Offer Improper Sur-Rebuttal Testimony.**

The AEGI Rebuttal Report, in part, and the Glasgow Rebuttal Report, in its entirety, also contain improper sur-rebuttal opinions. Rebuttal is appropriate only to counter "new facts brought out in [the] opponent's case in chief." *In re Trasylol*, 2010 WL 4065436, at *2. Numerous cases confirm that when an expert's report seeks to counter criticisms and explain why the expert was right all along, rather than counter new facts, the expert engages in improper sur-rebuttal. For

instance, in *Sibley v. Sprint Nextel Corp.*, the court struck as improper sur-rebuttal portions of a report that "verified that [the expert's] earlier conclusions were correct" and "generally attempt[ed] to provide additional rationale for [the expert's] original calculations and conclusions." 2013 WL 1819773, at *6 (D. Kan. Apr. 30, 2013).  Similarly, in *Djena v. Marine Technology, Inc.*, the court struck two reports when the reports they responded to raised no "'new' matters . . . that would justify a sur-rebuttal." 2013 WL 6768407, at *8 (D. Colo. Dec. 20, 2013).  Rebuttal was improper in that case because the reports to which the rebuttal experts responded "essentially criticiz[ed]" the initial expert report's "methodology and reached their conclusions without introducing new issues, facts or evidence into the case."  *Id.* at *9.  Thus, all that further rebuttal could have accomplished was correcting oversights in the case in chief. *Id.*; *see also Coward*, 282 F. Supp. 3d at 1331 (excluding "statements . . . that purport to rebut statements in [a] rebuttal report" as "improper sur-rebuttal").

While some of AEGI's rebuttal opinions do properly respond to new testing that Drs. Baron and Gray performed, much of the report seeks simply to justify the analysis in AEGI's opening report. For instance, pages 9-20 criticize Dr. Baron's analysis of the same cooling units that were the subject of attachments A-1 through A-9 of AEGI's opening report.  On pages 20-21, AEGI responds to Baron's "various comments on the feasible alternative designs/repairs *AEGI has proposed*," and criticizes the criticism in an attempt to bolster its initial report.  Similarly, the discussion under the heading "AEGI Report" at pages 26-28 does nothing more than attempt to explain why AEGI disagrees with Dr. Gray's criticisms of AEGI's opening report.

Likewise, the entirety of the Glasgow Rebuttal Report seeks to justify and resurrect the analysis performed by Dr. Glasgow in his initial report.  Indeed, the summary of the Glasgow Rebuttal Report openly explains that the report is intended only to explain why criticisms of his original report are incorrect, not to address new evidence.  The summary begins by summarizing what was said "[i]n my original report," then explains that he was "asked by Plaintiffs' counsel to respond to the opinions of certain of Defendant's experts in this case," and finally concludes that "[n]one of their opinions gives me cause to modify my calculations or alter any of my conclusions." Glasgow Rebuttal Report at 2-3.  Notably, the opinions to which Dr. Glasgow responds largely center around the *rebuttal* report of Dr. Robin Cantor—who merely submitted a rebuttal to Dr. Glasgow's original report and did not introduce *any* new facts or evidence into the case. *See generally* Expert Report of Dr. Robin Cantor (attached as Exhibit G); *see also id.* ¶ 7 ("I

have been engaged by Dometic . . . to provide an expert opinion with respect to the January 4, 2019 Expert Report of Garrett Glasgow, Ph.D."); *id.* ¶ 8 (summarizing "several methodological flaws that undermine Dr. Glasgow's damages methodology" in conclusion). Indeed, the vast majority of Dr. Glasgow's Rebuttal Report merely purports to rebut Dr. Cantor's rebuttal and to provide additional rationale for his original survey decisions and conclusions.[3] For instance, heading III in Dr. Glasgow's report summarizes the section as concluding that "Dr. Cantor's criticisms of the conjoint analysis are unfounded," and section IV explains why "the market simulation in my report" was correct. Glasgow Rebuttal Report at 10, 32. This is quintessential sur-rebuttal, which is improper and should be stricken.

To be clear, Dometic fully accepts that Plaintiffs' experts should have an opportunity to rebut *new evidence*, such as the testing that Drs. Baron and Gray conducted, through rebuttal reports, and it has not challenged these aspects of Plaintiffs' rebuttal reports. Dometic also accepts that Plaintiffs should have an opportunity to contest Dometic's experts' criticisms of Plaintiffs' experts. But the appropriate vehicle for addressing those criticisms is cross examination, not a "rebuttal" report that provides Plaintiffs' experts—but not Dometic's experts—an opportunity to bolster their opinions. *Dejana*, 2013 WL 678407, at *9. Striking the sur-rebuttal opinions in the AEGI and Glasgow Rebuttal Reports merely puts the parties' experts on equal footing. Each party's experts get an opportunity to provide affirmative expert reports and rebut the new evidence in the other party's expert reports. No party's experts are permitted to file "sur-rebuttal" reports that address other experts' criticisms of their methodologies or conclusions.

**REQUEST AND REASONS FOR EXPEDITED TREATMENT**

The rebuttal reports subject to this motion were served on Dometic one week ago, on March 13, 2019—one day before Plaintiffs' filed their motion for class certification. *See* ECF No. 345. The reports include improper new opinions that go to the presence and manifestation of the alleged class-wide defect in this case. Dometic's deadline to respond to Plaintiffs' class-certification motion is in three weeks, on April 11, 2019, and Dometic intends to file a *Daubert* motion at the

---

[3] Dr. Glasgow also devotes a handful of paragraphs to purportedly rebutting certainly opinions of Ms. Kwon, Mr. Duffus, Dr. Hanssens, and Mr. Lown. Glasgow Rebuttal Report ¶ 6 (Lown), ¶¶ 12-15 (Duffus) ¶ 73 (Kwon), ¶ 44 (Hanssens). Yet, these select criticisms are only made in the context of resurrecting Dr. Glasgow's original opinions. Notably, Plaintiffs also submitted a direct rebuttal of Ms. Kwon and Dr. Hanssens through Dr. Howlett and Dometic does not seek to strike that rebuttal report.

same time.  To permit Dometic to focus only on issues that are relevant in those filings and avoid severe prejudice to Dometic, Dometic requests that the Court resolve this motion by Friday, April 5, and require Plaintiffs' to respond to this motion no later than next Wednesday, March 27, and Dometic to reply by Monday, April 1.

## LOCAL RULE 7.1(a)(3) CERTIFICATE OF CONFERENCE

Counsel for Dometic conferred with Plaintiffs' counsel in a good-faith effort to resolve the issues in this motion and has been unable to do so.

DATED: March 20, 2019

*s/ Erica W. Rutner*
Erica Rutner (Fla. Bar No. 0070510)
erutner@lashgoldberg.com
Marty Goldberg (Fla Bar No.0827029)
mgoldberg@lashgoldberg.com
Greg Weintraub (Fla Bar No.0075741)
gweintraub@lashgoldberg.com
Michael Redondo (Fla. Bar No. 86550)
mredondo@lashgolsberg.com
Jonathan L. Williams (Fla. Bar No. 117574)
jwilliams@lashgoldberg.com
Nicholas A. Ortiz (Fla. Bar No. 117381)
nortiz@lashgoldberg.com
Gina P. Rhodes (Fla. Bar No. 118952)
grhodes@lashgoldberg.com
**LASH & GOLDBERG LLP**
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131
Telephone: (305) 347-4040
Fax: (305) 347-4050

Edward Soto (Fla. Bar No. 0265144)
Edward.Soto@weil.com
Lara Bach (Fla. Bar No. 0086734)
Lara.Bach@weil.com
Pravin R. Patel (Fla. Bar No. 0099939)
Pravin.Patel@weil.com
Corey Brady (Fla. Bar No. 0119859)
Corey.Brady@weil.com
**WEIL, GOTSHAL & MANGES LLP**
1395 Brickell Avenue, Suite 1200
Miami, Florida 33131
Telephone: (305) 577-3100
Fax: (305) 374-7159

*Counsel for Defendant Dometic Corp.*

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on March 20, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Erica Rutner*
**LASH & GOLDBERG LLP**
Erica Rutner
(Fla. Bar No. 0070510)
erutner@lashgoldberg.com
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131
Telephone: (305) 347-4040
Fax: (305) 347-4050