# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA

## Case No. 1:16-cv-22482-RNS

CATHERINE PAPASAN *et al.* and all
persons similarly situated,

                Plaintiffs,

v.

DOMETIC CORPORATION, a Delaware
Corporation,

                Defendant.

## DEFENDANT DOMETIC CORPORATION'S MOTION TO EXCLUDE THE OPINIONS OF AEGI AND GARRETT GLASGOW

## TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................................................. 1

LEGAL STANDARD.............................................................................................................. 2

ARGUMENT ........................................................................................................................ 2

   I.   The Court Must Conduct a *Daubert* Inquiry at this Stage ................................................ 2

   II.   AEGI's Opinions Should Be Excluded as Unreliable and Unhelpful ................................ 3

       A.  AEGI's First-Use Opinion Is Unhelpful and Unreliable ........................................... 3

       B.  AEGI's Common-Defect Opinion Is Unreliable ...................................................... 6

       C.  AEGI's Repair Option Opinions Are Unreliable...................................................... 11

       D.  AEGI's Respiratory Hazard Opinion Is Unreliable .................................................. 12

       E.  AEGI's Fire Hazard Opinion Is Unhelpful and Unreliable ....................................... 13

       F.  AEGI's Eventual Failure Opinion Is Unhelpful ...................................................... 14

       G.  AEGI's Opinions About Dometic's Knowledge Are Unhelpful ............................... 16

       H.  AEGI's Opinions About Dometic's Claim Records Should be Excluded.................. 16

   III.   The Glasgow Report Should Be Excluded As Unreliable ............................................ 16

       A.  Dr. Glasgow's Survey Is Fundamentally Flawed and Unreliable.............................. 17

       B.  Dr. Glasgow's Market Simulation Is Similarly Unreliable ....................................... 22

       C.  Even Accepting Dr. Glasgow's Improper Survey and Market Simulation, They Do Not Yield Class-Wide Alleged Damages ................................................... 24

CONCLUSION.................................................................................................................... 25

## **TABLE OF AUTHORITIES**

### *Cases*

*Allison v. McGhan Med. Corp.*,
    184 F.3d 1300 (11th Cir. 1999) ........................................................ 15

*Bailey v. Allgas, Inc.*,
    148 F. Supp. 2d 1222 (N.D. Ala. 2000) .............................................. 23

*Brown v. Electrolux Home Prod., Inc.*,
    2017 WL 2952281  (S.D. Ga. July 10, 2017) ....................................... 9

*Cates v. Whirlpool Corp.*,
    2017 WL 1862640 (N.D. Ill. May 9, 2017) ............................. 6, 10, 11, 23

*Chapman v. Maytag Corp.*,
    297 F.3d 682 (7th Cir. 2002) ............................................................. 6

*Chapman v. Procter & Gamble Distrib., LLC*,
    766 F.3d 1296 (11th Cir. 2014) .......................................................... 6

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
    509 U.S. 579 (1993) ............................................................... *passim*

*Dhillon v. Crown Controls Corp.*,
    269 F.3d 865 (7th Cir. 2001) ........................................................... 12

*Eberli v. Cirrus Design Corp.*,
    615 F. Supp. 2d 1357 (S.D. Fla. 2009) ............................................. 12

*Finestone v. Fla. Power & Light Co.*,
    272 F. App'x 761 (11th Cir. 2008) .................................................... 19

*First Premium Servs., Inc. v. Best W. Int'l, Inc.*,
    2004 WL 7203535 (S.D. Fla. Jan. 8, 2004) ................................... 22, 23

*General Electric v. Joiner*,
    522 U.S. 136 (1997) ......................................................................... 8

*Groditzky v. Am. Honda Motor Co.*,
    2017 WL 8943159 (C.D. Cal. Oct. 30, 2017) ................................. 11, 15

*Hendrix ex rel. G.P. v. Evenflo Co.*,
    609 F.3d 1183 (11th Cir. 2010) .......................................................... 5

*Hendrix v. Evenflo Co.*,
    255 F.R.D. 568 (N.D. Fla. 2009) ............................................................... 14

*Hi L.P. v. Winghouse of Fla., Inc.*,
    2004 WL 548696 (M.D. Fla. Oct. 5, 2004) .............................................. 18

*In re Denture Cream Prod. Liab. Litig.*
    795 F. Supp. 2d 1345 (S.D. Fla. 2011) ............................................. 22, 23

*In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*,
    2017 WL 1196990 (N.D. Ill. Mar. 21, 2017) .................................... passim

*In re Hardieplank Fiber Cement Siding Litig.*,
    2018 WL 262826 (D. Minn. Jan. 2, 2018) .................................................. 8

*In re Pella Corp.*,
    214 F. Supp. 3d 478 (D.S.C. 2016) ...................................................... 9, 11

*In re Rezulin Prod. Liab. Litig.*,
    309 F. Supp. 2d (S.D.N.Y. 2004) ...................................................... 16, 17

*In re Trasylol Prod. Liab. Litig.*,
    709 F. Supp. 2d 1323 (S.D. Fla. 2010) .................................................... 16

*Kaufman v. Pfizer Pharm., Inc.*,
    2011 WL 7659333 n.8 (S.D. Fla. Aug. 4, 2011) ...................................... 16

*Kumho Tire Co., Ltd. v. Carmichael*,
    526 U.S. 137 (1999) ...................................................................... 2, 4, 7

*Lebron v. Sec'y of Fla. Dep't of Children and Families*,
    772 F.3d 1352 (11th Cir. 2014) ............................................................... 2

*Martinez v. Altec Indus., Inc.*,
    2005 WL 1862677 (M.D. Fla. Aug. 3, 2005) .......................................... 12

*McClain v. Metabolife Int'l Inc.*,
    401 F. 3d 1233 (11th Cir. 2005) ..................................................... passim

*McDowell v. Brown*,
    392 F.3d 1283 (11th Cir. 2004) ........................................................... 2, 5

*Microsoft Corp. v. Manning*,
    914 S.W.2d 602 (Tex. Ct. App. 1995) ..................................................... 15

*Native Am. Arts, Inc. v. Bud K World Wide, Inc.*,
   2012 WL 1833877 (M.D. Ga. May 18, 2012) ........................................................... 17, 18, 20

*Ocasio v. C.R. Bard, Inc.*,
   2015 WL 2062611 (M.D. Fla. May 4, 2015) .................................................................... 16

*Oestreicher v. Alienware Corp.*,
   544 F. Supp. 2d 964 (N.D. Cal. 2008) ............................................................................ 15

*Padilla v. Hunter Douglas Window Coverings, Inc.*,
   14 F. Supp. 3d 1127 (N.D. Ill. 2014) ................................................................................ 6

*Phelan Holdings, Inc. v. Rare Hospitality Mgmt., Inc.*,
   2017 WL 1135266 n.7 (M.D. Fla. Mar. 27, 2017) .......................................................... 18

*R&R Int'l, Inc. v. Manzen, LLC*,
   2010 WL 3605234 (S.D. Fla. Sept. 12, 2010) ................................................................. 25

*Rule v. Fort Dodge Animal Health, Inc.*,
   604 F. Supp. 2d 288 (D. Mass 2009) .............................................................................. 15

*Serrano v. Am. Airlines*,
   2016 WL 6600499 (S.D. Fla. Nov. 8, 2016) ............................................................. 22, 23

*Sher v. Raytheon Co.*,
   419 F. App'x 887 (11th Cir. 2011) ................................................................................ 3, 4

*United States v. Frazier*,
   387 F.3d 1244 (11th Cir. 2004) ................................................................................ *passim*

*Williams v. Wells Fargo Bank, N.A.*,
   280 F.R.D. 665 (S.D. Fla. 2012) ....................................................................................... 3

*Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*,
   237 F. Supp. 3d 1230 (M.D. Fla. 2017) .......................................................................... 20

### Rules

Federal Rule of Evidence 702 ......................................................................................... 1, 2

Federal Rule of Civil Procedure 23…………………………………………………………….3

iv

**TABLE OF EXHIBITS**

| Exhibit | Description |
| --- | --- |
| Exhibit 1 | January 4, 2019 Expert Report of Peter Layson and Orion Keifer (AEGI Report) |
| Exhibit 2 | January 4, 2019 Expert Report of Garrett Glasgow |
| Exhibit 3 | January 29, 2019 Deposition Transcript of Orion Keifer (full) |
| Exhibit 4 | March 1, 2019 Deposition Transcript of Peter Layson (full) |
| Exhibit 5 | March 13, 2019 AEGI Supplemental Rebuttal Report |
| Exhibit 6 | February 4, 2019 Expert Report of Doug Lown |
| Exhibit 7 | Amazon.com: Dometic DM2652RB Americana Double Door RV Refrigerator |
| Exhibit 8 | *Corrosion Fatigue*, R. Barry Dooley and Albert Bursik <br> • Exhibit 6, Deposition of Orion Keifer |
| Exhibit 9 | Gary Graus's Responses to Defendant's First Set of Interrogatories |
| Exhibit 10 | April 9, 2019 Amendment to Richard Baron Expert Report |
| Exhibit 11 | February 4, 2019 Declaration of Michael A. Bernstein, M.D. and Wagdy W. Wahba, Ph.D. |
| Exhibit 12 | Dometic Installation Instructions <br> • DometicConsolidated_000643104-118 |
| Composite Exhibit 13 | NHTSA Documents <br> • DometicConsolidated_001346029-031 <br> • DometicConsolidated_000019571-573 |
| Exhibit 14 | NHTSA Document <br> • DometicConsolidated_001360298-301 |
| Exhibit 15 | January 16, 2019 Deposition Transcript of Patrick McConnell (excerpts) |
| Exhibit 16 | August 15, 2017 Deposition of Bruce Boxum (excerpts) |
| Exhibit 17 | February 13, 2019 Expert Report of Robin Cantor |
| Exhibit 18 | January 31, 2019 Deposition Transcript of Garrett Glasgow (full) |
| Exhibit 19 | February 4, 2019 Expert Report of Dominique Hanssens |
| Exhibit 20 | Dometic Residential Refrigerators (filed under seal) <br> • DometicVarner_058442-456 |
| Exhibit 21 | January 25, 2019 Deposition Transcript of Brian Quinn (excerpts) |
| Exhibit 22 | March 7, 2019 Deposition Transcript of La Mesa RV Center (excerpts) |
| Exhibit 23 | March 13, 2019 Expert Rebuttal Report of Garrett Glasgow |
| Exhibit 24 | April 20, 2017 Expert Declaration of Doug Lown |
| Exhibit 25 | February 4, 2019 Declaration of Gary Coggins |
| Exhibit 26 | FEMA Report (filed under seal) <br> • Exhibit 5, Deposition of Orion Keifer |
| Exhibit 27 | Attachment A-3 to AEGI Report |

Dometic Corporation ("Dometic") respectfully moves the Court for an order excluding the expert reports and proposed testimony of Messrs. Orion Keifer and Peter Layson of AEGI (the "AEGI Rep.") and Dr. Garrett Glasgow (the "Glasgow Rep."), pursuant to Federal Rule of Evidence ("Rule") 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).[1]

## PRELIMINARY STATEMENT

In support of their Motion for Class Certification [ECF No. 345], Plaintiffs rely heavily on the AEGI and Glasgow Reports.  In particular, Plaintiffs rely on the AEGI Report in an attempt to prove the existence of a classwide manifest defect and they rely on the Glasgow Report in an attempt to establish classwide damages.  But both the AEGI and Glasgow Reports suffer from pervasive methodological flaws that render them highly unreliable and inadmissible under *Daubert*.  As to AEGI, their opinion that a "corrosive process" begins upon first use in all Dometic-branded refrigerators ("Dometic Refrigerators") is both misleading and untested.  Likewise, AEGI's opinion that a population of nearly 5 million Dometic Refrigerators suffers from a common design defect is untested and unsupported by any reliable methodology.  Instead of performing testing to evaluate the alleged design issue—as industry standards require—AEGI "backtracked" that there must be a design issue because a handful of units have exhibited corrosion.  Indeed, their common defect opinion is based on observing corrosion in a grand total of 14 failed cooling units, a wholly biased and unrepresentative selection of the population of Dometic Refrigerators.  The remainder of their opinions—such as the theory that Dometic Refrigerators pose a respiratory or continued fire safety hazard or that there are better design alternatives—are also untested and based on nothing more than *ipse dixit*.  Simply put, AEGI has not employed any methodology that could conceivably support the sort of broad, far-flung conclusions contained in their report.  Thus, their opinions must be excluded under *Daubert*.

Similarly, the Glasgow Report is fundamentally flawed.  Among other serious problems, Dr. Glasgow's methodology for measuring classwide damages repeatedly ignores (and directly contradicts) the real-world marketplace for RV refrigerators.  He also makes numerous unsupported extrapolations and unreasonable assumptions at each step of his analysis.  Indeed, his ultimate damages opinion is premised on one methodological flaw built upon another, infecting the reliability of his entire report.  Dr. Glasgow's many methodological shortcomings—most of

---

[1] The AEGI Report is attached hereto as Ex. 1.  The Glasgow Report is attached hereto as Ex. 2.

which he eventually acknowledged at his deposition—readily justify the exclusion of his opinions.

## LEGAL STANDARD

Rule 702 requires courts to act as a "gatekeep[er]" over the admissibility of expert testimony, whether scientific or technical in nature.  *Daubert*, 509 U.S. at 597.  This gatekeeping obligation "'inherently require[s] the trial court to conduct an exacting analysis' of the foundations of expert opinions to ensure they meet the standards for admissibility under Rule 702." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004).  Thus, the Eleventh Circuit has set forth a "rigorous three-part inquiry," which requires the Court to evaluate whether:

> (1) The expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact…to understand the evidence or to determine a fact in issue.

*Lebron v. Sec'y of Fla. Dep't of Children and Families*, 772 F.3d 1352, 1368 (11th Cir. 2014).  Plaintiffs, as proponents of their experts, bear the burden of establishing qualification, reliability, and helpfulness by a preponderance of the evidence.  *Frazier*, 387 F.3d at 1260.

The qualification prong requires that an expert have relevant "knowledge, skill, experience, training, or education."  Fed. R. Evid. 702.  The reliability prong requires the district court to analyze the expert's methodology, considering:

> (1) whether a theory or technique can be (and has been) tested; (2) whether it has been subjected to peer review and publication; (3) the known or potential rate of error of the particular technique; and (4) whether the theory or technique enjoys "general acceptance" within a "relevant scientific community."

*Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 149-50 (1999) (quoting *Daubert*, 509 U.S. at 592-94).  Finally, the helpfulness prong requires "an appropriate 'fit' with respect to the offered opinion and the facts of the case." *McDowell v. Brown*, 392 F.3d 1283, 1299 (11th Cir. 2004).

The objective of the district court's gatekeeping role is ultimately to ensure that an expert "employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field."  *Kumho Tire*, 526 U.S. at 152.  Here, the opinions of both AEGI and Dr. Glasgow fail these requirements.

## ARGUMENT

**I.**     **The Court Must Conduct a *Daubert* Inquiry at this Stage**

The Eleventh Circuit has held that where expert testimony is relevant to establishing the

2

requirements of Rule 23, a full *Daubert* analysis is required at the class certification stage.  *See Sher v. Raytheon Co.*, 419 F. App'x 887, 890-91 (11th Cir. 2011).  As the court in *Sher* articulated, "[t]he district court must [] resolve any challenge to the reliability of the information provided by an expert if that information is relevant to establishing any of the Rule 23 requirements for class certification."  *Id.* (citation omitted) (reversing order granting class certification because the district court failed to conduct a *Daubert* inquiry).  This Court has expressly heeded that instruction at the class certification stage.  *See Williams v. Wells Fargo Bank, N.A.*, 280 F.R.D. 665, 671 (S.D. Fla. 2012) (Scola, J.) (conducting a "complete *Daubert* analysis" at the class certification stage).

Here, Plaintiffs seek certification of putative classes comprised of purchasers of 21 different Dometic Refrigerator models across nine states and over a two decade period.  *See* Motion for Class Cert. [ECF No. 345] (the "Motion"), p. 3.  In seeking certification, Plaintiffs rely on the AEGI Report to argue (among other things) that all the cooling units in the Dometic Refrigerators at issue "share[] a common design defect" and that "the onset of corrosion from the common design defect manifests in each Class Members' cooling unit on first use."  *Id.*, p. 5.  Likewise, Plaintiffs rely on the Glasgow Report in contending that they can "prove [] damages on a classwide basis." *Id.*, p. 18.  Thus, this is clearly a case where a "rigorous analysis" of Rule 23 mandates a full *Daubert* analysis of the AEGI and Glasgow opinions.  *See Sher*, 419 F. App'x at 890-91.[2]

## II.    AEGI's Opinions Should Be Excluded as Unreliable and Unhelpful

### A.    AEGI's First-Use Opinion Is Unhelpful and Unreliable

AEGI opines that all Dometic Refrigerators are defective because their cooling units will experience "excess corrosion."   AEGI Rep., p. 22; Keifer Dep., Ex. 3, 83:21-84:9.  At his deposition, Mr. Keifer defined "excess corrosion" as that which "extends into the tube appreciably and starts thinning the tube…and starts deteriorating the [] wall."  *Id.*, 84:3-85:13.  However, AEGI does not specifically opine that any kind of deteriorating, damaging, or "excess" corrosion will begin upon first use.  Rather, they vaguely opine that a "*corrosive process* will begin in every cooling unit upon first use" (the "First-Use Opinion").  AEGI Rep., pp. 7, 26.  This is a critical distinction.  As AEGI readily acknowledged, a *protective* corrosive process initially occurs, which

---

[2] AEGI also offers opinions specific only to the fire claims alleged by the named Plaintiffs.  Given that the Court has allowed the parties to file separate *Daubert* motions such that they can address class opinions at this stage and Plaintiff-specific opinions at a later stage [ECF No. 354], Dometic has deferred raising AEGI's Plaintiff-specific opinions at this time.

Mr. Keifer described as "the initial forming of the magnetite layer, which is corrosion…. It's a passive layer" and it is "*desirable* to protect the tube."  Keifer Dep. 15:7-16:8 ("[T]he tenacious layer that you put on there is a corrosion layer…. That is *not* bulk disintegration of the metal itself.").[3]   Indeed, Mr. Keifer repeatedly drew a "distinction" between the desirable passive corrosion layer that forms initially and "excess" corrosion, which he describes as corrosion that extends "beyond the passive layer."[4]   As Mr. Layson put it: "the original corrosion is – it is *different* in that its intended purpose is for the passivation layer."  Layson Dep., 178:4-9. Moreover, AEGI agreed that this initial corrosion process is "not at all" something that Dometic should eliminate.  *Id.*, 178:15-18.  They also agreed that if the protective layer is damaged, the chromate in the system can heal the damage and "that would not be excessive."  *Id.*, 182:16-20, Keifer Dep., 95:2-8.  Rather, "it's the [] repeated insult to the passive layer that – that is the problem."  *Id.*, 95:2-8.  That can take years to occur, though, depending on the refrigerator's operating history.  *Id.*, 95:11-20.

AEGI's rebuttal report (the "AEGI Rebuttal Rep.," Ex. 5) further illustrates the nature of their opinions about the "corrosive process."   In particular, in contrast with AEGI, Dometic's expert examined a Dometic cooling unit after 24 hours of use and found "[n]o evidence of *any* damage to the protective layer of the boiler tube…the boiler tube was completely intact, with no thinning or pitting observed."  Report of R. Baron ("Baron Rep."), ECF No. 373-17, p. 15.  Rather, what was observed was the "presence of a *protective* passive, chromium-rich coating."  *Id.* (emphasis added).  In their rebuttal report, AEGI contends that the test demonstrates a "preferential oxide layer" at the boiler tube and therefore confirms their opinion that the "corrosive process…begins with first use."  AEGI Rebuttal Rep., p. 7.  However, the "preferential oxide layer" to which they refer *is the protective passive coating*.  Keifer Dep., 89:22-23 ("the passive layer…it's an oxide layer that's tenacious, that protects it").  Thus, AEGI's statement that the test confirms that a "corrosive process…begins with first use" only corroborates that the "corrosive process" to which they refer is a desirable and beneficial process—not a damaging one.

Given AEGI's concessions, the "corrosive process" that they claim occurs on first use

---

[3] *Id.*, 60:13-14 ("the passive layer [] is a desirable thing"); 89:22-23 ("it's an oxide layer that's tenacious, that protects it"); Layson Dep., Ex. 4, 179:22-25 (same).

[4] Keifer Dep., 84:3-18, 91:4-7 ("So I'm trying to draw the distinction between forming and keeping the passive layer and protecting the passive layer and continuing to breach the passive layer and damaging the underlying tube.").

cannot plausibly reflect the "excess corrosion" process that they claim is the manifestation of the defect.[5]  In that case, AEGI's First-Use Opinion is not helpful to Plaintiffs' theory that the *defect* manifests on first use—a theory they must advance in order to establish standing for the claims of the putative class.[6]  Indeed, in light of AEGI's acknowledgment that the initial corrosion process is desirable and should not be eliminated, it is highly misleading for Plaintiffs to rely on the First-Use Opinion to establish the existence of a manifest defect.[7]  Where an expert's opinion is not helpful to advancing Plaintiffs' defect theory or would confuse or mislead the jury about that theory, it should be excluded under *Daubert*.  *McDowell*, 392 F.3d at 1299 (an expert's testimony is admissible only if "it logically advances a material aspect of the case"); *Frazier*, 387 F. 3d at 1267 (helpfulness prong is not satisfied where expert offers "imprecise and unspecific" opinions because these "easily could serve to confuse the jury, and might well have misled it").

Moreover, when asked if he believed that all Dometic cooling units would experience "excess" or damaging corrosion upon first use, Mr. Keifer merely speculated that he "would be surprised if they didn't."  Keifer Dep., 103:6-17.  This sort of rote speculation is precisely the kind prohibited by *Daubert*.  *See, e.g.*, *McDowell*, 392 F.3d at 1298 (expert testimony must be grounded in scientific knowledge, "meaning something more than subjective belief or unsupported assumptions"); *Hendrix ex rel. G.P. v. Evenflo Co.*, 609 F.3d 1183, 1194 (11th Cir. 2010) ("The courtroom is not the place for scientific guesswork, even of the inspired sort.").  In any event, Mr.

---

[5] Indeed, it is inconceivable that damaging or "excess corrosion"—which Mr. Keifer described as corrosion that thins the tube *beyond* the passivating layer—can occur on first use when they concede that there is a continual re-passivating process over time that protects the system and prevents just such an occurrence.

[6] Plaintiffs must advance this theory on behalf of the putative class because the Court previously held that a consumer who has not experienced a product failure must at least show an inherent defect that is "manifest at the point of sale" in order to establish standing.  ECF No. 219, p. 6.

[7] While AEGI attempts to conflate the protective corrosive process and damaging corrosion by simply referring to a "corrosive process" and claiming that the damaging corrosion initially "starts" with the protective layer (AEGI Rebuttal Report, p. 7), they cannot reliably opine that there is a manifest defect on first use when the initial oxide layer is admittedly desirable and should not be eliminated. Indeed, the design alternatives that they propose are specifically intended to "prevent that oxide layer from being compromised"—not eliminate it.  Layson Dep., 183:2-14.  Even if the protective passive layer might eventually be disrupted at some indeterminate time in the future, that does not render the process that is manifest on first use any less desirable or beneficial.

Keifer submitted this speculation—about a population of nearly 5 million refrigerators[8]—without examining *even one* Dometic Refrigerator upon first use.  Keifer Dep., 103:18-20.  Nor did AEGI examine a refrigerator that had been used for 6 months or even 1 year.  *Id.*, 80:1-14.  In fact, the youngest refrigerator they inspected was 2-3 years old.  *Id.*, 80:7-14.

"Scientific methodology today is based on generating hypotheses and testing them to see if they can be falsified; indeed, this methodology is what distinguishes science from other fields of human inquiry."  *Daubert*, 509 U.S. at 593.  Thus, as the Eleventh Circuit has reiterated, "[h]ypotheses are verified by testing, not by submitting them to lay juries for a vote."  *Chapman v. Procter & Gamble Distrib., LLC*, 766 F.3d 1296, 1311-12 (11th Cir. 2014).  A scientific opinion offered without "any testing" "cannot fairly be characterized as scientific knowledge" and is generally inadmissible under *Daubert*.  *Chapman v. Maytag Corp.*, 297 F.3d 682, 688 (7th Cir. 2002).  Indeed, Mr. Keifer readily acknowledged that the scientific method requires the testing of a hypothesis and that the scientific method is the accepted methodology for reaching conclusions to a reasonable degree of engineering certainty.  Keifer Dep., 53:23-54:8.

Despite Mr. Keifer's understanding of the importance of the scientific method, he conceded the following: "Q. But you've not done any testing on a Dometic cooling unit that's only had one use to prove or disprove whether there's damage to the passivating layer upon first use, correct?  A. That's correct."  *Id.*, 107:4-8.  AEGI's decision not to test a hypothesis is "particularly troubling" in a case like this, where the hypothesis "actually lend[s itself] to hands-on testing and empirical study."  *Padilla v. Hunter Douglas Window Coverings, Inc.*, 14 F. Supp. 3d 1127, 1137 (N.D. Ill. 2014); *accord Cates v. Whirlpool Corp.*, 2017 WL 1862640, at *15 (N.D. Ill. May 9, 2017).  AEGI expressly states that the internal damage caused by the alleged design defect is visible if the refrigerator is "sectioned (cut open)."  AEGI Rep., p. 22.  AEGI could have easily obtained new refrigerators, subjected them to use, and sectioned them, had they so desired.[9]  But they made no effort to do so.  Because AEGI has not examined a single Dometic Refrigerator to test the hypothesis that even one cooling unit will manifest damaging corrosion upon first use, they certainly cannot reliably opine that all Dometic cooling units will do so.

### B.        AEGI's Common-Defect Opinion Is Unreliable

---

[8] *See* Kwon Rep., ECF No. 373-16, pp. 10, 12-13.

[9] Dometic Refrigerators are available through RV dealers, and can even be obtained on Amazon.com.  *See* Report of D. Lown, Ex. 6 ("Lown Rep."), ¶ 25; Amazon.com print out, Ex. 7.

As noted above, AEGI contends that all Dometic cooling units are defective because they will experience "excess corrosion" at the boiler tube (the "Common Defect Opinion"). AEGI postulates that cyclic thermal stresses caused by the concentration of heat flux at the boiler tube result in hot spots and are the root cause of the "excess corrosion" that allegedly occurs in all cooling units. AEGI Rep., pp. 18-19. But, again, AEGI never tested this theory consistent with the methodology that Mr. Keifer admits is appropriate. At deposition, he testified as follows:

> Q. So you agree that the stress level has to be evaluated in order to estimate the probability of corrosion fatigue failures.
> A. Yes
> Q. Okay. Have you ever analyzed the stress level in a Dometic cooling unit?
> A. I have not looked specifically at the stress level.

Keifer Dep., 141:2-9; *see also* Dooley & Bursik, Ex. 8 (cited at AEGI Rep., p. 24 n.33). Indeed, testing the stress level is a "standard part of any analysis of root causes." Dooley & Bursik, p. 591. AEGI also has not analyzed how much cyclic stress is necessary to damage a cooling unit's protective layer, nor have they otherwise attempted to calculate the magnitude of the thermally induced cyclic stress that they claim is the root cause of the defect. Keifer Dep., 142:16-22, 146:16-22.[10] Mr. Keifer's failure to conduct any evaluation of the stress level—when that is standard and necessary in order to evaluate corrosion fatigue failures—runs afoul of the basic principle that a witness must "employ[] in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire Co.*, 526 U.S. at 152.

Rather than performing this necessary testing, AEGI purports to justify their theories by claiming that "*the analysis is we see the results of—of the defect, and we are now backtracking*…to understand why. And that's [] essentially what I'm trying to do. And I have not analyzed all of those things." Keifer Dep., 145:6-11; *id.*, 143:3-8 ("What we observed is the [] *results* of the hotspots in the boiler tube; in other words, we're getting a thickening, we're getting corrosion… All of those things are the evidence of what I have in my report"); 142:1-9 (asked if he ever analyzed the amount of cyclic stress required to damage the protective layer, Keifer responded "it's clear from the evidence with the ones that we have cut up is that clear damage is occurring and it's resulting in the excess corrosion and the failures of the boiler tube…. *So we – we see the*

---

[10] This is critical because Mr. Keifer testified that the cyclic stresses can damage the protective chromate layer "if they're large enough" and the "less the cyclic stress is, the less damage [] that'll occur over time, which would extend the life." *Id.*, 139:13-140:4.

*results there*.").  Essentially, AEGI has purportedly observed some level of damaging corrosion in a small number of cooling units and is now "backtracking" to conclude that (1) the corrosion was necessarily caused by a *defective* level of thermal stress in the system[11]; (2) these thermal stresses are the same in every unit made over 20-year period (despite conceding that changes made to the units would impact the stresses, as discussed below); and (3) these thermal stresses will cause "excess corrosion" in every single cooling unit.  As the Court in *General Electric v. Joiner* admonished, there is simply "too great an analytical gap between the data and the opinion proffered." 522 U.S. 136, 146 (1997).

Not only has AEGI failed to test the mechanics of their theory, but they have failed to test an adequate sample of Dometic Refrigerators to show a common defect.  AEGI's opinions about what they have "observed"—which they extrapolate to a population of millions— is based on inspecting a grand total of *14* cooling units.  *See* AEGI Rep., pp. 13-16.[12]  These 14 units ranged in age from 2-16 years—13 of which had been part of an RV fire and 1 of which had allegedly leaked.[13]  Indeed, AEGI did not evaluate a *single* unit that was used but still operational.[14]  Courts conducting *Daubert* analyses have repeatedly recognized that using already-failed products to

---

[11] AEGI concedes that the system must have some level of thermal stress to operate.  Keifer Dep. 135:21-136:2. (testifying that it is impossible to eliminate all cyclic stresses because then "you wouldn't have any heat transfer of—into the boiler and it wouldn't work.  There has to be a hotspot to – to make, you know, heat go from where it is to where it isn't.").

[12] While Mr. Keifer ambiguously claimed that AEGI has conducted other inspections, the AEGI Report only documents and discusses inspections of 14 cooling units and Mr. Keifer repeatedly claimed that these 14 inspections were a sufficient basis for his opinion.  Keifer Dep., 83:8-16. Indeed, no information was every reported or provided by AEGI about these other supposed inspections and thus AEGI cannot rely on them under Rule 26(a)(2)(B).  Mr. Keifer also pointed to a 2-page report that Dometic prepared regarding a handful of failures in Dometic Refrigerators being used in trailer parks set up after Hurricane Katrina.  *See* Ex. 26 (FEMA Report).  But this report showed that only *2.3%* of this select population of refrigerators had failed (refrigerators that Mr. Keifer never inspected or had any data about) and—more importantly—it never reported that the failures were caused by corrosion, much less corrosion induced by thermal stresses.  Thus, Mr. Keifer's reliance on this document runs contrary to the well-established principle that an expert cannot "draw[] unauthorized conclusions from limited data—conclusions the author of the study did not make."  *McClain v. Metabolife Int'l Inc.*, 401 F. 3d 1233, 1248 (11th Cir. 2005).

[13] Dometic disputes that these fires were caused by a Dometic Refrigerator.

[14] Layson Dep., 174:11-175:18 (testifying that, other than the Cherry unit (an alleged leak), AEGI did not rely on any examinations of units that were not involved in a fire and that AEGI had "not done any material examinations on units that were not involved [in a fire]"); *id.*, 205:9-21 (same).

assert that a class-wide defect exists is methodologically unsound.  *See In re Hardieplank Fiber Cement Siding Litig.*, 2018 WL 262826, at \*9 (D. Minn. Jan. 2, 2018) (recognizing that to rely on plaintiff's failed products is to "cherry pick[] . . . 'flawed' samples" that might not exist in the population at large); *Brown v. Electrolux Home Prod., Inc.*, 2017 WL 2952281, at \*4  (S.D. Ga. July 10, 2017) (excluding opinion "improperly based on a selective sample" because it was based on products that already "have problems"); *In re Pella Corp.*, 214 F. Supp. 3d 478, 493 (D.S.C. 2016) (testing only "allegedly defective" products "overstate[s] the incidence of [] problems in the overall population").  AEGI's reliance on units that were the subject of an RV fire (13 of the 14) is particularly problematic given Mr. Layson's concession that a fire itself can "absolutely" cause corrosion, that the process of extinguishing a fire can "absolutely" cause corrosion, and that failing to protect a fire scene can also cause corrosion.  Layson Dep., 87:18-88:8.

Worse, AEGI did not examine a single cooling unit that was subject to the significant welding improvements made between 2006 and 2007.  In particular, in January 2006, Dometic cooling unit production shifted from a manual to an automated welding process.  Then, in August 2007, the 135/ISO 5817-C welding quality control standards were implemented.[15]  Plaintiffs' experts readily agreed that the way in which welding is performed—particularly, whether it is manual or automatic and whether welding specifications are applied—will impact the quality of the weld and that a properly-adjusted automated weld would be less susceptible to irregularities and anomalies.  Keifer Dep., 111:24-113:9; Layson Dep. 117:11-19.  They further agreed that irregularities or anomalies in the welding can contribute to corrosion and that a good quality weld reduces susceptibility to corrosion.  Keifer Dep. 17:11-19, 111:14-23, 114:22-115:1.  Indeed, Mr. Keifer agreed that a poor weld with anomalies can lead to less uniform heat transfer, increased hotspots, and more susceptibility to localized cyclic stresses.  *Id.*, 113:10-25, 136:11-12.  These are the *precise* corrosion-inducing issues identified in the AEGI Report (pp. 6, 18-21).

Incredibly, AEGI discounts these changes because—allegedly—they are "continuing to see the same problems after these changes [and] that is the basis for it being a design issue.  I mean, we're still seeing the same problems after these changes."  Keifer Dep., 128:9-17.  When asked what that statement was based upon, Mr. Keifer responded, "It's based on the cooling units, yes, that we've inspected to date.  And more specifically, the cooling units that we have listed here [in

---

[15] *See* Baron Rep., pp. 9-10; *see also* Composite ECF No. 373-20.

the report].” *Id.*, 128:18-25.  But review of the inspections identified in the AEGI Report reveals that they did not examine a *single cooling unit* subject to the collective welding changes.[16]  AEGI cannot reliably opine that they are “continuing to see the same problems after these changes”— and that a “common defect” therefore exists—when they have not even looked at a single cooling unit that reflects all of these changes.[17]  Notably, in forming their opinions about the alleged *common* defect, AEGI “never asked th[e] question,” “didn’t pay attention to,” and did not consider it to be “an important parameter” as to when the unit was manufactured or whether it contained these changes.  Keifer Dep., 75:18-76:12.  But it is well-settled that “[i]ignoring relevant data is not a scientifically valid method.”  *Cates*, 2017 WL 1862640, at *15.[18]

    In short, Plaintiffs have not subjected their Common Defect Opinion to testing that satisfies the rigors of *Daubert*.  Their opinions about the alleged cause of the defect (*i.e.*, thermal cyclic stresses) are not based on *any* testing that specifically evaluates or confirms that opinion.  And their “backtracked” observations about the alleged defect are based on inspecting a total of 14

---

[16] The refrigerator’s serial number can be used to determine the specific week of a specific year that the refrigerator was manufactured, as explained in the Kwon Rep., pp. 7-8. Based on the serial numbers identified in the AEGI Report (pp. 13-16), none of the refrigerators they inspected were manufactured after August 2007. Although the AEGI Report does not identify the serial number for the Graus refrigerator and his RV was manufactured in 2007, his interrogatory answers clarify that “based on the serial number – my refrigerator was manufactured during the 37th week of 2006.”  Graus Interrogatory Answer No. 1, Ex.  9; *see also* Amendment to R. Baron Rep., Ex. 10.

[17] While AEGI inspected a total of 2 units made with automatic welding (*see* AEGI Rep., pp. 13-16), neither of these units were made when the ISO welding specification standards were in place. Mr. Keifer himself emphasized that automated welding is only effective if the weld is “adjusted properly”—which is precisely what is accomplished by virtue of the ISO welding standards. Keifer Dep., 112:13-113:9.   Moreover, of those two units, the Graus refrigerator purportedly exhibited only “superficial” corrosion that was in its “incipient stages” after 9 years in service. AEGI Rebuttal Report, p 18; Keifer Dep., 204:20-205:1. AEGI’s original report is glaringly silent with respect to the Graus refrigerator. *See* AEGI Rep., Attachment A-3, Ex. 27. At a minimum, the Graus refrigerator reinforced the need to test a sample of units that accounted for these changes.

[18] Indeed, AEGI also ignored Dometic’s warranty claims data, despite testifying that they “like to look at everything…it’s certainly something I’d review if I had.”  Keifer Dep., 132:17-134:11. The claims data is particularly relevant because it demonstrates a statistically significant decrease in the claims rate on units made after the changes were in place.  *See* Kwon Rep., pp. 12-13. Ironically, when Mr. Keifer was asked whether Dometic’s competitor had eliminated the same alleged common defect from its product by introducing a particular design change that he recommended, he stated: “No I can’t say that… Now, *their claims rate is kind of the proof in the pudding*. But, you know, we’ll have to wait and see.”  Keifer Dep., 216:21-217:7.

cooling units—all of which had already failed, all but one of which were part of an RV fire, and none of which reflected the collective welding changes in place since 2007. This population is far too small, biased, and non-representative to reach a reliable conclusion about millions of products. As numerous courts have made clear, common-defect opinions are not reliable when experts seek to extrapolate from a few tests to a much larger product population. *See, e.g.*, *In re Pella*, 214 F. Supp. 3d at 491 (testing 477 windows insufficient to opine that 7.5 million windows shared a common defect); *Groditzky v. Am. Honda Motor Co.*, 2017 WL 8943159, at *4 (C.D. Cal. Oct. 30, 2017) (examination of 26 window regulators could not show common defect among 441,600 products in class); *Cates*, 2017 WL 1862640, at *15 (testing 2 washing machines was not a reliable basis for opining that 2,000,000 washing machines contained a common defect).

Notably, in place of testing or other accepted methodologies (such as subjecting their theories to peer review and publication or identifying a known rate of error), AEGI points to *ipse dixit* catchphrases like "basic engineering principles" and "common sense." Keifer Dep. 143:21-22; Layson Dep. 267:9-22. But "[i]n the *Daubert* context, such phrases have little value. They are not shibboleths that distinguish those experts that offer reliable science from those who foist junk science on the court." *McClain*, 401 F.3d at 1244; *see also Frazier* 387 F. 3d at 1261 ("[T]he expert's bald assurance of validity is not enough…. admissibility [cannot] be established merely by the *ipse dixit* of an [] expert."). AEGI's failure to employ any sort of reliable science in support of their Common-Defect Opinion renders the opinion inadmissible under *Daubert*.

### C.    AEGI's Repair Option Opinions Are Unreliable

In their report, AEGI also proposes a number of alternative designs as "feasible [] repair options to remedy the problem" (the "Repair-Option Opinions"). AEGI Rep., pp. 24-25. Yet, AEGI has not performed a single test to evaluate the feasibility of any of these options. Keifer Dep. 94:11-18; Layson Dep. 183:8-11. Specifically, AEGI did not test whether any of the "repair options" would appreciably extend the life of the cooling unit or whether they would introduce any adverse consequences. Keifer Dep., 195:8-197:11. AEGI failed to do so even though Mr. Keifer admitted that many of the options introduce other "downsides," many of which are "well-known and established." *Id.*, 195:11-196:3; *see also id.*, 206:5-207:1. Even as to the one "repair option" that Dometic's competitor Norcold has purportedly adopted, Mr. Keifer would not opine that this eliminated the "common defect" because "their [Norcold's] claims rate is kind of the proof in the pudding. But, you know, we'll have to wait and see." *Id.*, 216:21-217:6.

11

Not only has AEGI failed to test the proposed alternative designs, they have never designed or manufactured cooling units or worked for anyone who has.  Keifer Dep. 211:6-12; Layson Dep. 20:15-21.  As Mr. Layson put it: "we don't design refrigerators.  So we don't—we haven't done the testing."  *Id.*, 183:9-11.  AEGI's failure to conduct any sort of testing on the design alternatives—particularly when coupled with their lack of relevant experience in designing cooling units and their concession that the alternatives also have downsides—renders the Repair-Option Opinion readily excludable under *Daubert*.  *See, e.g.*, *Eberli v. Cirrus Design Corp.*, 615 F. Supp. 2d 1357, 1366 (S.D. Fla. 2009) (expert opinion not based on a reliable methodology because the expert "merely concluded, without any testing or comparison of engines" that an alternative design should have been adopted); *Dhillon v. Crown Controls Corp.*, 269 F.3d 865, 869-70 (7th Cir. 2001) ("In alternative design cases, we have consistently recognized the importance of testing the alternative design."); *Martinez v. Altec Indus., Inc.*, 2005 WL 1862677, at *7-8 (M.D. Fla. Aug. 3, 2005) (excluding alternative design opinion from expert who lacked experience designing relevant product and had not tested proposed alternative design).

### D.     AEGI's Respiratory Hazard Opinion Is Unreliable

AEGI also opines—without proffering any supporting data—that a leak of ammonia in a Dometic cooling unit presents a "serious respiratory hazard" (the "Respiratory Hazard Opinion"). AEGI Rep., p. 19.  When asked for the basis of this opinion, all Mr. Keifer could point to is the fact that some people have reported *smelling* ammonia and that Dometic instructs consumers to shut off the refrigerator if they *smell* ammonia.  Keifer Dep., 233:13-24; 237:20-238:12; 240:1-6; 242:14-19.  But there is no question that ammonia odor can be detected at rates far lower than those capable of causing respiratory distress.  *See* Decl. of M. Bernstein and W. Wahba, Ex. 11, pp. 33-34.  Otherwise, many common household cleaners would cause routine respiratory distress. Indeed, while ammonia odor can be detected at levels as low as 5 parts per million (ppm), even mild irritation will not occur unless the exposure exceeds a concentration of 30 ppm for 10 minutes. *Id.*  Yet, AEGI is unable to say with any degree of certainty how much ammonia can enter an RV cabin in the case of a leak in a properly installed refrigerator.  Layson Dep., 131:10-14.[19]  Faced

---

[19] Dometic's installation manual provides explicit instructions outlining the importance of proper sealing to prevent gas leakage into the living area.  *See, e.g.*, DometicConsolidated_000643104, Ex. 12 (installation manual stating "!WARNING: All joints in the enclosure must be sealed to prevent gas leakage into the living area.").  Notably, in the cases in which ammonia odor had been reported, AEGI has no basis for concluding that the refrigerators were properly sealed and

with this concession, Mr. Layson even disclaimed any opinion that ammonia can leak into the RV cabin in amounts capable of causing clinical effects.  *Id.*, 144:19-25.

AEGI cannot offer such an opinion because they have done no testing whatsoever to evaluate what level of ammonia—if any—can enter the RV cabin in the case of a leak (whether in a properly or improperly installed refrigerator).  Keifer Dep., 240:1-6; 242:14-19.  It is a well-settled principle that the "relationship between dose and effect (the dose-response relationship) is the hallmark of basic toxicology" and is the "single most important factor to consider in evaluating whether an alleged exposure caused a specific adverse effect."  *McClain*, 401 F.3d at 1242.  AEGI's utter failure to test what concentration of ammonia (if any) enters the RV cabin and whether that concentration is actually capable of causing "serious respiratory hazards" renders the Respiratory Hazard Opinion wholly unreliable under *Daubert*.  *See id.*

### E.    AEGI's Fire Hazard Opinion Is Unhelpful and Unreliable

AEGI also ambiguously opines that a leaking cooling unit presents a "safety risk of fire" (the "Fire Hazard Opinion").  AEGI Rep., p. 23.  Elsewhere, AEGI vaguely refers to "potential fire[s]" and a "fire hazard" associated with a leak.  *Id.*, pp. 7, 22.  But there is no dispute that there is a remote risk of a safety-related fire in the (non-retrofitted) refrigerators that Dometic recalled in 2006 and 2008.  That is precisely why Dometic conducted the recalls in the first place.[20]  However, to address that risk, Dometic provided a safety remedy intended to prevent any potential ignition from spreading outside the burner area and posing a safety hazard to consumers (the "Safety Remedy").[21]  The Safety Remedy, which was comprised of two thermal switches and a thermal shield (known as the "Secondary Burner Housing"), was provided as a retrofit kit for field installation on recalled Dometic Refrigerators and was factory-installed on relevant refrigerator models made after the recalls.  Notably, the AEGI Report never directly states that the Safety Remedy is ineffective at preventing a fire safety risk or that a safety risk continues in refrigerators containing the Safety Remedy.  In fact, when directly asked if he intended to offer an opinion that the Secondary Burner Housing fails to adequately prevent a flame from spreading outside the

---

installed.  Keifer Dep., 235:7-18.  Indeed, it is undisputed that the Cherry refrigerator—the only example of a respiratory complaint by a Plaintiff in this case—was not properly installed in the RV.  *See* Decl. of Gary Coggins, Ex. 25, pp. 23-24.

[20] DometicConsolidated_001346029 & DometicConsolidated_000019571, Composite Ex. 13.

[21] DometicConsolidated_001360299, Ex. 14; 2019 McConnell Dep., Ex. 15, 304:6-12, 320:8-12.

burner area, Mr. Layson (Plaintiffs' fire expert) stated: "At this time, *I'm not*…. At this time, I don't have anything – any opinions prepared." Layson Dep., 145:1-10.

The distinction here is critical. In their Complaint, Plaintiffs contend that the Safety Remedy is ineffective at preventing safety-related fires and that a fire risk still remains. *See, e.g.*, Consolidated Complaint [ECF No. 300], p. 116. Likewise, in their Motion for Class Certification, Plaintiffs argue that "the heat shield [*i.e.*, the Secondary Burner Housing] is ineffective" and they cite to the AEGI Report in support. Mot., n. 12. But, as discussed above, AEGI never actually offered such an opinion. Rather, they ambiguously refer only to a potential fire hazard—a fact that is not in dispute with respect to recalled refrigerators without the Safety Remedy. Thus, AEGI's ambiguous Fire Hazard Opinion is not helpful to the trier of fact in resolving a factual dispute and cannot be misleadingly relied upon by Plaintiffs. *Daubert*, 509 U.S. at 591 (expert testimony must be "sufficiently tied to the facts of the case so that it will aid the jury in resolving a *factual dispute*") (emphasis added); *see also Frazier*, 387 F.2d at 1267.

Nor could AEGI reliably opine that the Safety Remedy is ineffective at preventing safety-related fires. When asked his view of the issue at deposition, Mr. Keifer pointed to a *single* unverified report of a fire allegedly caused by a refrigerator containing the Safety Remedy. Keifer Dep., 248:21-249:8. However, Mr. Keifer never performed any independent analysis of this report to determine whether, in fact, the fire even originated at the refrigerator (much less was *caused* by the refrigerator). Putting aside the fact that this single unverified report is facially insufficient, an expert cannot "simply repeat or adopt the findings of other experts without investigating them." *Hendrix v. Evenflo Co.*, 255 F.R.D. 568, 607 n.75 (N.D. Fla. 2009); *see also* Layson Dep. 121:13-16 (agreeing that it is inappropriate to uncritically rely on a fire investigator's conclusions). Certainly, AEGI has never done any testing of the Secondary Burner Housing to support such an opinion. *Id.*, 145:11-19. Likewise, while AEGI speculates that the cooling solution could migrate to the RV cabin and encounter a source of ignition, they concede that the solution contents are only flammable at certain concentrations. *Id.,* 129:4-8, 130:20-131:4. Yet again, however, they have conducted no testing to determine whether flammable concentrations of either hydrogen or ammonia could ever migrate into the RV cabin. *Id.*, 132:2-16, 133:2-7; *see also* Keifer Dep. 245:23-246:5. At bottom, AEGI has not employed any methodology—much less a reliable one—to capably offer opinions that a fire safety risk still exists in Dometic Refrigerators.

**F.     AEGI's Eventual Failure Opinion Is Unhelpful**

AEGI opines that corrosion will "eventually" cause leaks and failures in all Dometic cooling units (the "Eventual Failure Opinion").  *See* AEGI Rep., pp. 6-7, 20, 26-27.  But this "eventuality" is not tied to any particular period of time—much less the supposed 15-year useful life of the refrigerator.[22]  Indeed, Mr. Keifer repeatedly conceded that he does not "have the data to say that all"—or even what percentage—of Dometic refrigerators will fail within this anticipated useful life.[23]  As Mr. Layson put it, "we do have an interest" in how long a Dometic Refrigerator will last under different operating parameters and this is a "very interesting question," but "I don't think there is sufficient data."  Layson Dep., 270:12-271:7.  Of course, the reason there is not sufficient data is because—again—AEGI has made no effort to conduct testing to obtain the data.

AEGI's vague opinion that corrosion will "eventually" cause leaks is not helpful to the trier of fact.  The helpfulness requirement mandates not just that the testimony fit the facts of the case, but also that it is helpful in light of the relevant legal standards.  *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1320 (11th Cir. 1999).  The law is clear that when a product "has already performed as warranted for the duration of its useful life," the consumer has "received the full benefit of the bargain" and lacks any "legally cognizable injury."  *Rule v. Fort Dodge Animal Health, Inc.*, 604 F. Supp. 2d 288, 296-97 (D. Mass 2009).[24]  Indeed, if an "inherent defect" could be shown based on the fact that the product will eventually fail at some indefinite point in time, then "[f]ailure of a product to last forever would become a 'defect. … and product defect litigation would become as widespread as manufacturing itself.'"  *Oestreicher v. Alienware Corp.*, 544 F. Supp. 2d 964, 972 (N.D. Cal. 2008).  Thus, the notion that the units might "eventually" leak—divorced from the useful life of the product or *any* period of time—is not helpful in light of the relevant legal standards.  As such, the Eventual Failure Opinion should be excluded.  *See Grodzitsky*, 2017 WL 8943158, at *3 (excluding expert opinion that product was defective because it did not last

---

[22] Mr. Keifer believes the useful life of the refrigerator should be 15 years.  Keifer Dep., 11:14-20.

[23] Keifer Dep., 13:11-17, 13:24-14:12, 52:17-23, 29:12-30:1, 31:3-10.

[24] *See also Am. Honda Motor Co. v. Superior Court*, 1999 Cal. App. 4th 1367, 1375 (Cal. App. 2011) (while plaintiffs do not have to demonstrate a current malfunction of the product, they "must provide substantial evidence of a defect that is substantially certain to result in malfunction during *the useful life of the product*"); *Microsoft Corp. v. Manning*, 914 S.W.2d 602, 609 (Tex. Ct. App. 1995) (products like "[t]ires and cars have a distinctly limited usable life. At the end of the product's life, the product and whatever defect it may have had pass away. If a defect does not manifest itself *in that time span*, the buyer has gotten what he bargained for") (emphases added).

indefinitely and reasoning that "[w]ithout some objective basis to indicate how long [a product] should last, alleging that they are defective as soon as they are installed is simply circular").

G.     **AEGI's Opinions About Dometic's Knowledge Are Unhelpful**

Similarly unhelpful are AEGI's opinions that the "existing record in evidence demonstrates Dometic's awareness of the design defect, the failure of Dometic's prior recalls to remedy that defect, and the substantial risk of fire that accompanies the defect" (the "Knowledge Opinions"). AEGI Rep., p. 7.  These opinions are improper because an opinion about a party's "knowledge, intent or state of mind… invades the province of a jury, which is capable of deciding such matters without an expert's help." *Ocasio v. C.R. Bard, Inc.*, 2015 WL 2062611, at *4 (M.D. Fla. May 4, 2015) (collecting cases); *see also Kaufman v. Pfizer Pharm., Inc.*, 2011 WL 7659333, at *9 n.8 (S.D. Fla. Aug. 4, 2011) (precluding expert opinions about defendant's "knowledge and state of mind" based on an "interpretation of … internal documents"); *In re Trasylol Prod. Liab. Litig.*, 709 F. Supp. 2d 1323, 1337-38 (S.D. Fla. 2010) (same).

H.     **AEGI's Opinions About Dometic's Claim Records Should be Excluded**

AEGI also cannot opine that "[i]t appears from the existing record in evidence that the number of fires reportedly caused by Dometic refrigerators is far greater than Dometic publicly reported" (the "Claim Records Opinion").  AEGI Rep., p. 7.  First, Rule 702 prohibits expert testimony "about lay matters which a jury is capable of understanding and deciding without the expert's help." *In re Rezulin Prod. Liab. Litig.*, 309 F. Supp. 2d at 531, 541 (S.D.N.Y. 2004).  Mr. Layson testified that AEGI reached this opinion by "comparing some documents in the production to each other and then by comparing them to AEGI's own files" to see if the claims listed were the same.  Layson Dep., 190:7-11.  The jury does not require an engineer to compare claims documents against each other.  Second, even if it were the proper subject of expert testimony, the opinion would be unreliable because it is not based on the database in which Dometic actually collects fire claims.  Dometic maintains data about fire claims on Dometic Refrigerators in an Access database, not in the spreadsheets that AEGI references.  Boxum Dep., Ex. 16, 106:5-23.  However, Mr. Layson testified that AEGI did not consider Dometic's Access database in forming their opinions. Layson Dep., 192:20-25.  Thus, the Claim Records Opinion is divorced from Dometic's actual claims database, rendering it neither reliable nor helpful in this matter.

III.   **The Glasgow Report Should Be Excluded As Unreliable**

Dr. Glasgow offers broad conclusions about a purportedly uniform overcharge paid by all

purchasers of Dometic Refrigerators. His process was as follows: He began with a conjoint survey administered to a population of current and prospective RV owners. Glasgow Rep., pp. 11-13. In theory, this survey was supposed to test how consumer preferences for RV refrigerators change as certain features of the refrigerators change—including whether the refrigerator uses gas absorption or compressor technology. *Id*. The survey included a "treatment" group that was shown a hypothetical fire warning regarding gas absorption refrigerators, as well as a "control" group that was not. *Id.* Based on respondents' choices, Dr. Glasgow then estimated coefficients that purportedly suggest whether and to what extent a given attribute (as well as the hypothetical fire warning) affects a respondent's likelihood of choosing a given refrigerator. *Id.*, pp. 29-32. Next, Dr. Glasgow used these coefficients to create an alleged reduction in consumer willingness to pay ("WTP") for gas absorption refrigerators with the hypothetical fire warning. *Id.*, pp. 32-33. As Dr. Glasgow recognized, this demand-side reduction in WTP is only part of the picture, so he then created a "market simulation" to represent the supply side. *Id.*, pp. 33-36. His market simulation uses the survey results, along with three other necessary inputs, to model how Dometic would purportedly respond to a change in demand—and ultimately arrives at a purported 5.4% reduction in price of an "average Dometic refrigerator." *Id.*, pp. 36-42. Finally, Dr. Glasgow uses this purported price reduction to arrive at alleged classwide damages. *Id.*, pp. 43-44.

The conjoint survey and market simulation are each so fundamentally flawed and unreliable that Dr. Glasgow's testimony must be excluded under *Daubert*. Like a house of cards, the survey and simulation rest atop faulty methodologies stacked one upon another—rendering them unreliable and inadmissible under *Daubert*.

### A.   Dr. Glasgow's Survey Is Fundamentally Flawed and Unreliable

A consumer survey with fundamental methodological flaws "may be of so little utility as to be rendered irrelevant—and thus inadmissible." *In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig.*, 2017 WL 1196990, at *28 (N.D. Ill. Mar. 21, 2017); *see also Native Am. Arts, Inc. v. Bud K World Wide, Inc.*, 2012 WL 1833877, at *6 (M.D. Ga. May 18, 2012). That is precisely the case with Dr. Glasgow's survey. It does not merely suffer from a few technical problems; rather, its entire methodology is so deficient as to render it inadmissible.

*First*, the survey tests the wrong population. Dometic sells the vast majority (92%) of its gas absorption refrigerators directly to Original Equipment Manufacturers (OEMs), who build RVs and sell those RVs to RV dealers, who in turn sell those RVs to consumers. *See* Lown Rep.,

¶¶ 19, 25; Report of R. Cantor, Ex. 17 ("Cantor Rep."), ¶¶ 28-31.[25] Dometic does not sell *any* refrigerators directly to consumers. *Id.* Dr. Glasgow was well-aware of this market structure. *See* Glasgow Dep., Ex. 23, 22:12-16, 23:18-24:25. Yet, Dr. Glasgow chose to simply ignore it, and instead tested *only* the purchasing preferences of consumers—who are not Dometic's customers and who generally have no experience purchasing standalone RV refrigerators. *See* Glasgow Rep., p. 13. Nor did Dr. Glasgow attempt to account, in any way, for the preferences of Dometic's actual customers.

Courts have excluded similar conjoint surveys for precisely this reason. For instance, in *Fluidmaster*, as here, the plaintiffs' expert propounded a conjoint survey that would be administered to consumers in an attempt to calculate classwide damages using the WTP reduction associated with an alleged product defect. 2017 WL 1196990, at *27. Also, as here, the market structure involved a manufacturer selling most of its product to wholesalers and installers, not directly to consumers. *Id.* at *28-29. Although the survey ignored the preferences of the real buyers, *i.e.* wholesalers and installers, the plaintiffs argued that the consumer population was appropriate because consumers are the end users. *Id.* at *29. The court rejected this argument, reasoning that the expert needed to "identify a representative sample of those who buy Defendant's products," which she had not done because she "does not evaluate whether the preferences of [installers] and ordinary consumers are the same or account for any differences if they are not. She simply ignores the majority of typical purchasers [*i.e.*, wholesalers and installers] in her survey. *That significantly undermines the relevance of her survey*." *Id.* at *29 (emphasis added). Dr. Glasgow has done exactly the same thing here. For this reason alone, his testimony should be excluded. *See id.*; *see also Hi L.P. v. Winghouse of Fla., Inc.*, 2004 WL 548696, at *8 (M.D. Fla. Oct. 5, 2004) ("Most significantly, the failure to include a single female in the survey, when women comprise nearly a third of Hooters' customer base and perhaps even more of Winghouse's clientele, reflects a *patently flawed methodology striking at the very heart of the survey's validity*." (emphasis added)); *Phelan Holdings, Inc. v. Rare Hospitality Mgmt., Inc.*, 2017 WL 1135266, at *7 n.7 (M.D. Fla. Mar. 27, 2017) (similar).

*Second*, Dr. Glasgow makes the unsupported, *ipse dixit* leap that consumer WTP for a hypothetical standalone *refrigerator* can be extrapolated to consumer WTP for an *RV*—the product

---

[25] Dometic sells a small portion of its gas absorption refrigerators (8%) as standalone units to RV dealers for aftermarket refrigerator replacement. *Id.*

that nearly all consumers are actually purchasing in this market.  Dr. Glasgow does not even attempt to explain why this extrapolation is appropriate, despite having acknowledged that real-world consumers acquire RV refrigerators as part of a "bundle" of products in the RV, where "they typically have to make some trade-offs."  Glasgow Dep., 89:4-12. Again, this same flaw persuaded the *Fluidmaster* court to exclude an analogous conjoint survey.  There, as here, the plaintiffs' expert "never explain[ed] why the WTP of a consumer purchasing a home with hundreds of products already installed (including [the product at issue]) is comparable to a consumer making an isolated purchase of [that product]."  2017 WL 1196990, at *29.  Relatedly, because the plaintiffs offered no reliable basis for concluding that the alleged overcharge was not absorbed by the wholesaler or installer—again as here—the court found reliability and relevance concerns warranting exclusion.  *Id.*; *see also Finestone v. Fla. Power & Light Co.*, 272 F. App'x 761, 768 (11th Cir. 2008) (an expert makes "the kind of scientifically unsupported 'leap of faith' which is condemned by *Daubert*" when he is not "able to provide support for the assumption" underlying his methodology).[26]  This is another independent reason to exclude the survey.

*Third*, the survey fails to account for the real-world marketplace.  In particular, it is predicated on the false assumption that RV buyers can readily choose between gas absorption refrigerators and compressor refrigerators when purchasing RVs.  Glasgow Rep., pp. 17-19, 21. Yet, consumers do not select refrigerators in the marketplace.  They select RVs with a whole host of products—only one of which is the refrigerator—and they typically do not have an opportunity to select which refrigerator will be installed in their RV.  Glasgow Dep., 20:15-24, 24:8-25, 34:2-35:2, 39:7-23, 89:4-12.  Beyond that, compressor refrigerators are not widely available for installation in RVs.[27]  Dr. Glasgow simply claimed ignorance and/or a failure to investigate these marketplace realities.[28]  Thus, without corroborating information—and in the face of admittedly *contrary* information—Dr. Glasgow designed and administered a survey that patently fails to

---

[26] These concerns are even more acute here, where Dr. Glasgow further opines—with no reliable basis—that any overcharge "will carry through to the used market."  Glasgow Rep., p. 44.

[27] *See* Lown Rep., ¶¶ 17-18.  Indeed, Dr. Glasgow readily admits that compressor refrigerator manufacturers "do not directly compete in the RV refrigerator market."  Glasgow Rep., p. 38. Likewise, Dr. Glasgow admitted at his deposition, "I've seen no evidence … that suggests that any compressor refrigerator manufacturer was moving into the RV market."  Glasgow Dep., 246:5-8.

[28] *See, e.g.*, *id.*, 85:16-18, 184:16-19, 28:20-29:3, 31:3-6, 35:16-19, 36:8-10, 75:3-11, 126:18-20, 34:2-35:2, 39:7-23.

reflect the way consumers view the product in the marketplace.[29]  This is yet another ground for exclusion.  *See Native Am. Arts*, 2012 WL 1833877, at*6 ("In order to be considered reliable, a survey must resemble the way consumers would view the products in the marketplace" and finding survey did not meet this standard because it failed to provide complete and accurate information to respondents); *Yellowfin Yachts, Inc. v. Barker Boatworks, LLC*, 237 F. Supp. 3d 1230, 1240 (M.D. Fla. 2017) (survey was unreliable because it "omit[s] many of the [product] details").

*Fourth*, Dr. Glasgow's method for selecting the attributes of his survey was unscientific, untested, and not grounded in pertinent expertise.  Dr. Glasgow has no experience in refrigerator marketing, has never done any market research on refrigerators, and has never studied consumers' preferences with respect to refrigerators (such as through a focus group, interviews, or even just reviewing Plaintiffs' deposition transcripts).  Glasgow Dep., 109:18-110:20.  Nevertheless, Dr. Glasgow took a stab at guessing what features of gas absorption refrigerators are most important to consumers: his unscientific method was to browse through Dometic's and Norcold's websites and to pick features "due to the prominence with which they were displayed."  *Id.*, 112:7-16.  This method resulted in Dr. Glasgow arbitrarily excluding certain critical refrigerator attributes, such as size, from his survey design.  Dr. Glasgow eventually conceded at his deposition that refrigerator size *was* a common attribute and *was* mentioned in every single instance on the websites he browsed—meaning it should have satisfied his own purported selection criteria.  *Id.*, 113:7-12, 114:3-10.  Dr. Glasgow's unscientific and inconsistent method for picking attributes further undermines his survey.  *See Fluidmaster*, 2017 WL 1196990, at *31 (rejecting similar conjoint survey in part because the expert did "not indicate how she decided these other attributes were unimportant, how she determined they could not be measured, or whether she attempted to come up with a proxy").[30]  Indeed, it is black-letter law that mere guesses and decisions based on what seems reasonable to an expert do not satisfy *Daubert*.  *See McClain*, 401 F.3d at 1237.

---

[29] In contrast, when Dr. Hanssens performed a survey intended to test the materiality of a disclosure regarding the alleged defect, he did so in the context of the actual purchasing experience of the consumers (*i.e.*, by testing choices in the context of an RV purchase, not a refrigerator purchase).  *See generally* Report of D. Hanssens, Ex. 19.

[30] Dr. Glasgow arbitrarily excluded other important attributes.  For example, he excluded the refrigerator's power source, despite conceding that this attribute may be an "important feature" to consumers.  Glasgow Dep., 123:25-124:6.  He also excluded the refrigerator's warranty, even though Plaintiffs' claims are largely based on a breach of warranty.  *Id.*, 169:18-25.

*Finally*, Dr. Glasgow's survey was infected with misleading and biased information. In particular, he presented compressor refrigerators as *superior products*, while simultaneously *omitting* many drawbacks and dangers associated with their use.[31] Dr. Glasgow admittedly has no expertise in how either gas absorption or compressor refrigerators work. *Id.*, 130:5-12. He has not done any research on the efficiency or efficacy of either type of refrigerator, nor does he have any engineering or manufacturing background that would enable him to do so. *Id.*, 130:13-131:5, 316:14-317:7. Yet, he unreservedly told respondents—without any support—that a compressor refrigerator "chills and freezes food *more effectively* than a gas absorption refrigerator." Glasgow Rep., p. 19 (emphasis added).[32] The bias introduced by this misleading language was further compounded by Dr. Glasgow's omission of numerous potential safety hazards and costs associated with the use of compressor refrigerators in RVs. Glasgow Dep., 161:10-15.[33]

It was unreasonable for Dr. Glasgow to suggest (without relevant expertise) that compressor refrigerators are superior, while also omitting their numerous drawbacks. After all, his survey is specifically designed to test whether consumers would prefer compressor or gas

---

[31] *But see* Glasgow Dep., 10:16-11:4 (acknowledging that a survey should not introduce bias).

[32] The two sources that Dr. Glasgow relied on to support this characterization do nothing of the sort. The first source is a dated Dometic presentation relevant only to certain *very large* refrigerators—larger than most at issue here and which cannot even be installed in most RVs. Glasgow Rep., 19 n.34 (citing DometicVarner_058442-56 at 50-51, Ex. 20). Indeed, Dr. Glasgow accepted that the presentation does not apply to commonly sold sizes of RV refrigerators. Glasgow Dep., 142:1-5. The second source is the expert declaration of Doug Lown from the *Varner* matter, which certainly does not say that compressor refrigerators are more effective. Glasgow Rep., 19 n.34 (citing 2017 Expert Declaration of Doug Lown, Ex. 24, ¶¶ 9-11). To the contrary, the paragraphs cited by Dr. Glasgow describe how much more flexible and useful gas absorption refrigerators are when camping. Notably, Dr. Glasgow made clear he was not relying on anything other than these two sources when he designed the survey. *See* Glasgow Dep., 135:22-24 ("Q. Is it based on any other data or information or just these two sources? A. Just these two sources.").

[33] Indeed, Dr. Glasgow admitted that his survey failed to disclose that: (i) the refrigerant in compressor refrigerators is noxious and could leak into the RV cabin; (ii) compressor refrigerators tend to be heavier and could affect the RV's weight distribution and handling; (iii) existing gas lines may have to be terminated; (iv) compressor refrigerators may need special brackets and door locks to prevent them from potentially tipping over; (v) use of a compressor refrigerator in an RV may void its warranty; (vi) compressor refrigerators are not designed for RVs, and may thus require removal and/or customization of RV parts and trim; and (vii) compressor refrigerators would likely require installation of a separate AC/DC converter, batteries, electrical components, and possibly a generator. *See id.*, 161:16-164:22, 168:23-170:1, 173:25-185:24; *see also* Lown Rep., ¶¶ 13-16; Cantor Rep., ¶ 35; Quinn Dep., Ex. 21, 104:11-120:2.

absorption refrigerators.  These failures are further grounds for exclusion.  *See Native Am. Arts*, 2012 WWL 1833877, at *7-9 (excluding survey in part because the content was misleading, ambiguous, and unclear, and it therefore made the survey "slanted" toward a particular outcome); *Serrano v. Am. Airlines*, 2016 WL 6600499, at *2-3 (S.D. Fla. Nov. 8, 2016) (excluding expert's testimony where he ignored or downplayed contradictory evidence).

In sum, Dr. Glasgow's survey—upon which all his testimony stands—is fundamentally flawed.  The flaws are not merely technical, but rather go to the entire structure, validity, and relevance of the survey.  Each one is a good ground for excluding Dr. Glasgow's testimony.  *See McClain*, 401 F.3d at 1245 ("[A]ny step that renders the analysis unreliable under the *Daubert* factors renders the expert's testimony inadmissible.").  Together, they counsel overwhelmingly in favor of exclusion.  As in *Fluidmaster*, "[a]sking an unrepresentative group of purchasers to artificially assign values among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages."  2017 WL 1196990, at *31.

### B.  Dr. Glasgow's Market Simulation Is Similarly Unreliable

After conducting the flawed conjoint survey, Dr. Glasgow used the results in a "market simulation" to calculate alleged class-wide damages.  *See* Glasgow Rep., pp. 33-44.[34]  This market simulation reportedly requires three inputs: average product pricing data; the marginal cost of production for Dometic and Norcold; and relative market shares of Dometic, Norcold, and a third "outside option."  *Id.*, p. 38; Glasgow Dep., 243:19-244:3.  Yet, Dr. Glasgow's methodology for deriving these inputs was essentially to make them up.  He makes one groundless assumption atop another—to such an extent that his market simulation is utterly unreliable and unhelpful.  *See In re Denture Cream Prod. Liab. Litig.* (*"Chapman"*), 795 F. Supp. 2d 1345, 1363 (S.D. Fla. 2011) (an expert's opinion is not reliable when it is based on an inaccurate factual premise); *First Premium Servs., Inc. v. Best W. Int'l, Inc.*, 2004 WL 7203535, at *4 (S.D. Fla. Jan. 8, 2004) (excluding expert testimony on a "discount factor" because the expert "had no basis").

*First*, Dr. Glasgow assumed that average prices for *all* of Dometic's refrigerator sales can be derived from so-called dealer price lists—despite the fact that those lists relate only to Dometic's minority of aftermarket sales to RV dealers, and despite the fact that they reflect only

---

[34] As Dr. Glasgow acknowledges, demand-side data from a conjoint survey is not sufficient because the supply side must be considered as well.  Glasgow Rep., p. 34 & n.58.

suggested pricing that does not account for real-world variability.  As discussed in Section III.A, Dometic sells the vast majority of its refrigerators to OEMs, not dealers—a fact Dr. Glasgow knew. He nevertheless chose to *simply ignore* the predominant distribution chain in his market simulation, and instead focus exclusively on dealer price lists.[35]  His stated rationale was that he did not have data on Dometic's OEM sales.  *See id.*; *see also id.,* 40:1-15.  Yet, such data *is* in fact available—and has been since the *Varner* matter in 2017.  *See* 2017 Rebuttal Declaration of D. Duffus, ECF No. 149-NN, ¶¶ 48-51 (citing OEM pricing matrixes).  Thus, Dr. Glasgow's stated rationale for ignoring the majority of Dometic's sales—which he admitted, if available, would change his market simulation—is completely baseless.  This warrants excluding his testimony. *See e.g., Cates*, 2017 WL 1862640, at *15 ("[I]gnoring relevant data is not a scientifically valid method."); *Chapman*, 795 F. Supp. 2d at 1363; *First Premium Servs.*, 2004 WL 7203535, at *4.

The other glaring problem with Dr. Glasgow's reliance on dealer price lists is that those prices are merely suggestions, and therefore mask widespread real-world pricing variability (which would also apply to OEM pricing). Lown Rep., ¶¶ 20-24; Cantor Rep., ¶¶ 31-33, 45, 47.[36]  Dr. Glasgow readily admitted that one would expect to see pricing variability in transactions like these. Glasgow Dep., 41:2-18.  And he made clear that this pricing variability applies throughout the distribution chains, whether it be for OEMs, dealers, or consumers—such that "any particular transaction might occur at a different price than, than the listed price." *Id.*, 67:11-19.  Given this testimony, one would expect that Dr. Glasgow reasonably accounted for variability in deriving the average prices for his market simulation.  He did not.  Instead, he simply accepted the suggested prices from the dealer price lists—which, as discussed above, do not even apply to the vast majority of Dometic's sales—and ignored the real-world data.  This methodology was patently arbitrary and unreliable.  *See Serrano*, 2016 WL 6600499, at *2-3; *Bailey v. Allgas, Inc.*, 148 F. Supp. 2d 1222, 1238-46 (N.D. Ala. 2000).

*Second*, Dr. Glasgow "estimated" the marginal cost of production for Dometic and Norcold through purported markup ratios for Dometic refrigerators.  Glasgow Rep., pp. 41-42.  Here too,

---

[35] Glasgow Dep., 220:14-17, 222:4-13, 263:2-23.

[36] There are still other problems with Dr. Glasgow's methodology of deriving average prices.  For example, because he did not have Norcold price lists, he simply assumed that their pricing was identical to Dometic's.  Glasgow Dep., 265:8-11.  He also simply assumed that the average (and relative) prices for both manufacturers remained unchanged across time.  *Id.*, 63:6-16, 272:4-8.

Dr. Glasgow's methodology stacked one unreasonable assumption atop another. The first is that he relied, once again, on the problematic RV dealer price lists to arrive at a purported dealer-to-consumer markup ratio. *Id.* The second assumption is that he could compare this (already flawed) ratio to a markup ratio in a 2009 U.S. Department of Energy study on residential compressor refrigerators, which is not only a decade old, but is *completely unrelated* to RV refrigerators. Glasgow Dep., 272:17-273:10 ("Q. … The study doesn't have anything to do with RV refrigerators. Correct? A. I don't believe any part of the study addressed RV refrigerators."), 274:8-15. The third assumption is that the relative difference in manufacturer-to-dealer and dealer-to-consumer markup ratios is identical across these two completely different industries. *Id.*, 275:6-18, 276:8-11. Again, this assumption is not supported by any relevant data. *See id.*, 283:15-19 ("Q. Might it be the case that Dometic has very different markup ratios as between sales to OEMs and sales to dealers? A. I don't have any information on that one way or the other."), 284:6-10. The fourth and final unreasonable assumption is that Norcold has an identical marginal cost of production to Dometic. Glasgow Rep., pp. 41-42. Dr. Glasgow did no independent analysis of their comparative marginal costs. Rather, he simply assumed they were the same because of a Dometic document *estimating* that Norcold may have *similar* costs, and another document that actually shows the opposite, *i.e.* a different marginal cost for Norcold ($870 versus the supposed $619 that Dr. Glasgow calculates for Dometic). *See id.* & nn.76-77.

*Finally*, for relative market shares, Dr. Glasgow assumed without support that Dometic's and Norcold's market shares held precisely constant in 2013 as compared to their average over the preceding few years. Glasgow Dep., 254:22-255:7. Yet, Dr. Glasgow admitted at his deposition that "market share fluctuate[s] on a regular basis," and it is "unlikely to be exactly the same" from one year to another. *Id.*, 256:8-258:8. Such an admittedly inconsistent method cannot generate reliable, helpful information. For all these reasons—as well as the numerous flaws with his survey discussed in Section III.A—Dr. Glasgow's testimony should not be admitted.

### C.   Even Accepting Dr. Glasgow's Improper Survey and Market Simulation, They Do Not Yield Class-Wide Alleged Damages

Setting aside the numerous problems discussed above, Dr. Glasgow still cannot reliably opine on uniform, class-wide damages. To the contrary, the Glasgow Report attempts to overcome variability in alleged damages through what essentially amounts to hand-waving. For instance, although class members may own dozens of different models of refrigerators, manufactured across decades (with changes in pricing, design, manufacturing, and features during that time period),

which are used in widely varying ways, and which are sold or resold any number of times, Dr. Glasgow fabricates an "average Dometic refrigerator" in order to force his way to a single overcharge figure of $87.34. Glasgow Rep., p. 44. He does this to obscure the fact that he would otherwise have to apply his purported 5% overcharge to a multiplicity of varying refrigerator prices—which cannot be readily or uniformly determined based on the purchase price of the RV.[37]

Moreover, even though various types of buyers purchase Dometic Refrigerators through multiple distribution chains (either for installation in new RVs, as components of assembled RVs, or for the aftermarket), with pricing variability between and across each level, Dr. Glasgow simply assumes "all purchasers" will face an identical 5.4% overcharge—including purchasers of used refrigerators—without explaining how or why. Glasgow Rep., pp. 43-44; *see also* Glasgow Dep., 287:1-288:10. He even goes so far as to say that this identical 5.4% overcharge can somehow "be used to calculate an overcharge percentage on purchases of Dometic *cooling units*"—again without explaining how or why. Glasgow Rep., p. 44. Given the numerous problems with the inputs and methods in the Glasgow Report discussed above, it is hardly surprising that his final damages calculation appears to be little more than conjecture. Dr. Glasgow's wholly unsupported claims about a uniform, classwide overcharge should be excluded. *See R&R Int'l, Inc. v. Manzen, LLC*, 2010 WL 3605234, at *9, 16 (S.D. Fla. Sept. 12, 2010) (excluding damages methodology that did not rest on "adequate data" and instead on "mere speculation or guess"); *Frazier*, 387 F.3d at 1261 (the "basic foundation for admissibility" of expert testimony requires that it "be supported by appropriate validation—*i.e.*, good grounds, based on what is known").

## CONCLUSION

For the foregoing reasons, the opinions of AEGI and Dr. Glasgow do not pass muster under *Daubert*, and Plaintiffs should not be permitted to rely on these opinions in support of their Motion for Class Certification.

---

[37] There is no discernible correlation between the price of the RV and the price of the refrigerator *See* Lown Rep., ¶¶ 22-23, La Mesa Dep., Ex. 22, 77:13-20; Quinn Dep., 176:18-177:6. While Dr. Glasgow speculates—after the fact—that the MSRP of an aftermarket refrigerator somehow correlates to the price paid for a refrigerator that is a component of the RV, that assumption is based on aftermarket *upgrades* which can be made to the refrigerator—not on the pricing of RVs with the originally installed refrigerator. Glasgow Rebuttal Rep., Ex. 23, ¶¶ 17-18. Analysis of actual market pricing demonstrates that the MSRP of an aftermarket refrigerator has no bearing on the price of the refrigerator as a component of a completed RV. *See* 2019 Decl. of D. Duffus, ECF No. 371-A-51, ¶¶19-29.

Dated: April 16, 2019                    Respectfully submitted:

                                         *s/ Erica W. Rutner*
                                         Erica Rutner (Fla. Bar No. 0070510)
                                         erutner@lashgoldberg.com
                                         Marty Goldberg (Fla Bar No.0827029)
                                         mgoldberg@lashgoldberg.com
                                         Greg Weintraub (Fla Bar No.0075741)
                                         gweintraub@lashgoldberg.com
                                         Michael Redondo (Fla. Bar No. 86550)
                                         mredondo@lashgolsberg.com
                                         Jonathan L. Williams (Fla. Bar No. 117574)
                                         jwilliams@lashgoldberg.com
                                         Nicholas A. Ortiz (Fla. Bar No. 117381)
                                         nortiz@lashgoldberg.com
                                         Gina P. Rhodes (Fla. Bar No. 118952)
                                         grhodes@lashgoldberg.com

                                         **LASH & GOLDBERG LLP**
                                         100 Southeast 2nd Street, Suite 1200
                                         Miami, FL 33131
                                         Telephone: (305) 347-4040
                                         Fax: (305) 347-4050

                                         Edward Soto (Fla. Bar No. 0265144)
                                         Edward.Soto@weil.com
                                         Lara Bach (Fla. Bar No. 0086734)
                                         Lara.Bach@weil.com
                                         Pravin R. Patel (Fla. Bar No. 0099939)
                                         Pravin.Patel@weil.com
                                         Corey Brady (Fla. Bar No. 0119859)
                                         Corey.Brady@weil.com

                                         **WEIL, GOTSHAL & MANGES LLP**
                                         1395 Brickell Avenue, Suite 1200
                                         Miami, Florida 33131
                                         Telephone: (305) 577-3100
                                         Fax: (305) 374-7159

                                         *Counsel for Defendant Dometic Corp.*

## <u>Rule 7.1(a)(3) Certification</u>

Pursuant to Local Rule 7.1, I hereby certify that counsel for Dometic conferred with counsel for Plaintiffs in a good faith effort to resolve the issues in this motion and has been unable to do so.

<u>/s/ *Erica Rutner*</u>
**LASH & GOLDBERG LLP**
Erica Rutner
(Fla. Bar No. 0070510)
erutner@lashgoldberg.com
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131
Telephone: (305) 347-4040
Fax: (305) 347-4050

27

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on April 16, 2019, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record via transmission of Notices of Electronic Filing generated by CM/ECF.

/s/ *Erica Rutner*
**LASH & GOLDBERG LLP**
Erica Rutner
(Fla. Bar No. 0070510)
erutner@lashgoldberg.com
100 Southeast 2nd Street, Suite 1200
Miami, FL 33131
Telephone: (305) 347-4040
Fax: (305) 347-4050

28