UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CATHERINE PAPASAN *et al.* and all
persons similarly situated,

Case No. 1:16-cv-22482-RNS

    Plaintiffs,

v.

DOMETIC CORPORATION,

    Defendant.

_____/

**PLAINTIFFS' SUMMARY OF *DAUBERT* CHALLENGES**

At the Court's request, following the evidentiary hearing held September 13-14, 2021, Plaintiffs respectfully submit the following summary of their challenges to Defendant Dometic Corporation's proffered experts:

## I. AMY GRAY SHOULD BE EXCLUDED

### A. Dometic cannot meet its burden of affirmatively demonstrating that Dr. Gray has sufficient training, education, or experience to competently reach her opinions on the operation and failure of gas absorption refrigerators.

- Gray concedes that prior to being retained in this action, she had no experience with gas absorption refrigerators. She had not authored any peer reviewed articles or reference materials on the subject. She had no specific training or education in boiler theory, boiler design, boiler operation or boiler failure. Pltf. Ex 17 [Gray Dep.], at 12:9-13:3; 33:8-18; Hearing Tr. (Sept. 13, 2021), at 212:19-213:16; 89:14-90-24.

- Notwithstanding her lack of education, experience or training regarding gas absorption refrigerators, Gray never availed herself of the work of other Dometic experts more experienced in the field.

- Gray concedes that she knew that Dr. Elizabeth Buc's performed testing, including controlled release testing, of Dometic gas absorption refrigerators in 2006, and was aware that Dr. Buc developed the Secondary Burner Housing (SBH) in 2007– 2008. However, she never made any attempt to review this material or talk with Dr. Buc directly to inform herself about Dometic refrigerator failure or the development of the SBH. Hearing Tr. (Sept. 13, 2021), at 222:25-225:5.

- Gray concedes that she was aware that Jaime Petty-Galis–another of Dometic's litigation experts–had participated in a number of forensic materials exams of Dometic gas absorption refrigerators, but she never asked for or reviewed any of Ms. Petty-Galis' material to inform herself about Dometic refrigerator failure. Hearing Tr. (Sept. 13, 2021), at 221:10-222:24.

- Gray concedes she did not know, and did not inquire, about the actual fire claim history of Dometic gas absorption refrigerators. Hearing Tr. (Sept. 13, 2021), at 215:2-221:8.

- Gray concedes that she relied exclusively on Dometic's attorneys to provide her with information about Dometic gas absorption refrigerators and did not do any independent investigation to develop an understanding of the product other than that. Hearing Tr. (Sept. 13, 2021), at 215:11-15; 216:7-16; 219:4-220:9.

1

- B. **There is simply too great an analytical gap between Gray's unrelated test and her opinion on the efficacy of the SBH to confine fires caused by a leaking Dometic gas absorption refrigerator boiler tube to meet the *Daubert* test of reliability.**

    - Gray's opinion is based on a single experiment that she concedes was "unique," and which lacked any established methodology or error rate. Hearing Tr. (Sept. 13, 2021), at 239:24-240:15. Gray's experiment did not seek to replicate a leaking Dometic gas absorption refrigerator in the field, and did not use the same gases (ammonia and hydrogen); the same temperatures (400 F), or the same pressures (350 – 400 p.s.i) of a Dometic fridge. Gray's experiment also did not replicate the 100-200 micron-size leaks normally found in a failed Dometic boiler tube, using 635-micron and 710-micron holes instead. Pltf. Ex 17 [Gray Dep.], at 114:6-22; 115:17-116:20; 117:10-13; 118:7-11; Hearing Tr. (Sept. 13, 2021), at 228:5- 233:14.

    - Rather than test the SBH under real world conditions, Gray's experiment was a classic case of confirmation bias—creating an experiment to confirm a pre-determined hypothesis, i.e. that the SBH was effective to prevent fire spread from a leaking Dometic refrigerator. Gray offers no reliable methodology or logic to equate a flame created in the lab using isopropanol at ambient temperatures and pressures, with a flame caused by a release of ammonia and hydrogen at 400 F and 350 – 400 p.s.i. from an actual Dometic refrigerator.

    - Gray's experiment was based on a fundamental misunderstanding of the fire claim history of the product. Relying on her own lack of experience and information regarding Dometic refrigerators, and her failure to do any independent investigation of her own, Gray based her hypothesis that the SBH was effective on the "…fact that I haven't seen a claim report that confirms that there's been a fire in a secondary burner housing equipped Dometic refrigerator where the flame has extended beyond the SBH…" Hearing Tr. (Sept. 13, 2021), at 241:15-18. This assertion is directly contradicted by Sonya Kwon, who analyzed Dometic's fire claim database and determined that there were at least 158 fires in SBH equipped Dometic refrigerators. Hearing Tr. (Sept. 14, 2021), at 88:13-89:9.

- C. **Gray's conclusion that a properly installed refrigerator will not permit ammonia to reach a significant level of concentration within an RV is speculative and unreliable.**

    - Gray's conclusion is based on another "unique" experiment with no proven methodology, no known error rate, and used testing equipment that Gray had no

2

    experience with and failed to calibrate for accuracy before or after running her test. Hearing Tr. (Sept. 13, 2021), at 243:3-3-8; 244:19-245:12; Pltf. Ex 17 [Gray Dep.], at 205:8 – 207:24.

- Gray's test did not replicate an actual Dometic refrigerator, using only one component of the cooling solution (ammonia) at a temperature 100 degrees F less than the temperature of an operating refrigerator. Hearing Tr. (Sept. 13, 2021), at 246:15 - 247:7. Gray's experiment also did not test the effect of sealant degradation over time affecting the ability of gases from a leaking cooling unit to invade the living space of an RV. Pltf. Ex 17 [Gray Dep.], at 242:13 – 251:11.

- Gray concedes that her conclusion contradicts Dometic's own warning that smelling ammonia is one of the first signs of refrigerator failure, necessitating that the refrigerator be shut off immediately. Pltf. Ex 17 [Gray Dep.], at 242:13-21.

**D. The logical chasm between Dr. Gray's safety fuse plug testing and the actual failure of a Dometic gas absorption refrigerator is so wide that it is wholly irrelevant to the issues in this case.**

- Gray concedes that the purpose of the safety fuse plug installed on Dometic refrigerators is to release pressure in the system so the cooling unit does not suffer a rupture. However, Gray also concedes that Dometic refrigerator cooling units do rupture, which – by definition – confirms that the safety fuse plug does not operate as designed. Hearing Tr. (Sept. 13, 2021), at 252:14-255:1.

## II. SONYA KWON SHOULD BE EXCLUDED

**A. Kwon's analysis of leak and fire incident rates is unreliable and should be excluded because she fails to recognize that it is based on an incomplete data set: Dometic never maintained complete records of all fire and leaks claims.**

- Kwon's report attempts to analyze the incidence of claims related to cooling unit leaks and fires from the subject refrigerators based on two databases maintained by Dometic: (1) the Safety-Related Fire Claims Database, and (2) the Warranty Database. Kwon Report II at pp. 5-6; *See* Kwon Dep. (I) at 215:24-216:4, Hearing Tr. (Sept. 14, 2021), at 89:14-90-24. Kwon's report then attempts to draw conclusions from those purported incidence of claims rates, presenting them as a statistically significant way to measure the safety risks presented by Dometic refrigerators. Kwon Report II at pp. 5, 11-29.

- Kwon's analysis is unreliable as neither the (1) the Safety-Related Fire Claims Database, nor (2) the Warranty Database that Dometic maintained contained a complete

- set of data reflecting all fires and leak claims related to the subject refrigerators that were made by consumers, precluding Kwon from offering any reliable conclusions as to any actual claims rate or safety risks.

- With regard to the Safety-Related Fire Claims Database that Kwon analyzed, the custodian of the database at Dometic, Chris Jackson, testified that the database was incomplete as it only contained fire claims presented to Dometic that Mr. Jackson felt caused significant enough physical damage or personal injury to result in Dometic making a claim against its insurance carrier on. Fire claims involving lesser damage were never recorded in the database. Kwon failed to appreciate this distinction in the data maintained by Dometic and instead falsely assumed that the databases she analyzed included reports of "all" fires.

- *Compare,* Kwon testimony (Hearing Tr. (Sept. 14, 2021), at 78:14-80:19 ("They said everything that results in a personal injury or property damage was included in this database." … "Mr. Jackson represented to me that they tracked all safety-related fires, and that is what I believe they received."), *with* Jackson I Dep. at 65, 94:

  > Q. And if you don't -- if you decide not to send the claim to the insurance carrier, then there would not be a file in the database created?
  >
  > A. That's correct.
  >
  > ****
  >
  > Q. Okay. So if -- if an RV owner had their cooling unit stop working and break down due to a leak in the cooling unit but it didn't create any ancillary property damage or personal injury issue that would have necessitated involving the insurance company, that type of -- that type of a claim would not be either in your database or in these three monthly reports that -- that you prepare.
  >
  > A. It would not be in my database.

- *See also*, Affidavit of C. Jackson in *Bowman v. Dometic* (D. Minn.) at ¶ 3 ("Dometic Corporation does not maintain a separate database or otherwise aggregate claims files for fires "starting as a result of a leak in the coolant of the product.").

- Kwon's analysis of Dometic's Warranty Database was similarly unreliable as it does not contain a complete record of all leaks and fires and Kwon failed to recognize that the data set that she analyzed was underinclusive. When deposed, Dometic's Recall Supervisor and Rule 30(b)(6) representative on the topic of consumer complaints and claims, testified that (1) if a consumer made a complaint to Dometic of leak or fire and

the refrigerator was outside the 2 year warranty period, they were directed to call a third-party RV dealer for assistance and replacement/repair; (2) the Warranty Database did not record of any consumer leak or fire claims made through Dometic's "retail line"; (3) Dometic does not maintain records of leak or fire claims in the Warranty Database prior to 2013, as the process at that time was outsourced to third-party recall manager, Stericycle, who provided Dometic no such records. Wagner Dep. at 83:13-88:11. Yet, Kwon ignored this and inconsistently testified "I had a full population that was represented to me as warranty claims data, so I analyzed that because I believed that a superior source of data." Hearing Tr. (Sept. 14, 2021), at 92:2-11.

- At the hearing Kwon conceded that she failed to consider leak and fire reports possessed by third-party RV dealers, who would not have reported such incidents to Dometic to include in any database. This data would have reflected a higher rate of incidents.

- When deposed, RV Dealers, Brian Quinn (representative of Camping World, the largest RV dealer in the U.S.) and Doug Lown (VP of Coachlight RV Sales, Inc.) both testified that if a leak occurs in a refrigerator outside the short 2 year warranty period, they would generally not report it to Dometic but instead just repair/replace the defective refrigerator with a new one. Lown Dep. at 83:1-19; Quinn Dep. at 291:24-292:24. *See also*, Pls.' Mot. to Exclude the Expert Testimony of Amy Gray, Sonya Kwon, Dominique Hanssens, and Diane Cantor, (Apr. 25, 2019) [D.E. 395] (hereinafter "Pls.' Mot. to Exclude"), at pp. 3-4; Pls.' Reply in Support of Mot. to Exclude the Expert Testimony of Amy Gray, Sonya Kwon, Dominique Hanssens, and Diane Cantor (May 21, 2019) [D.E. 406] (hereinafter "Pls' Reply Mot. to Exclude"), at pp. 5-7 (citing Quinn Dep. at 292:2-25, Lown Dep. at 82:19-83:15) (detailing how RV Dealers would never report any refrigerator leaks to Dometic that fell outside the warranty period).

- While Kwon testified she did not seek to include any data from RV dealers regarding leaks sensing it would be incomplete, Kwon inconsistently failed to make the same conclusion with respect to Dometic, completely ignoring testimony confirming that it maintained incomplete data. Hearing Tr. (Sept. 14, 2021), at 102:9-23. Kwon's testimony that RV dealer's records of leak claims represent "an incomplete snapshot of data" that "wouldn't be representative of the actual underlying data" must hold equally true for the incomplete data set that Dometic maintained and Kwon used.

5

- Kwon and counsel claimed her report was re-run with additional data provided by in-house counsel but this does not magically render historical data that never existed complete. *See* Hearing Tr. (Sept. 14, 2021), at 86:15-87:2 (counsel lodging an objection regarding a line of questions concerning the data relied on and response to that objection). However, it does not matter that corporate counsel provided Kwon a copy of a database that was subsequently "updated." As detailed above, the data she claims to have analyzed never existed in a complete format—i.e., entire categories of leak and fire claims were never recorded, with the consumers making them turned away to seek repairs with third parties—so the described "updates" do not cure this fundamental flaw. Moreover, the new custodian—who replaced Chris Jackson—had no firsthand knowledge to authenticate that database (which Chris Jackson was also unable to do).

B. **The custodian of the primary data that Kwon analyzed, Chris Jackson, testified that he never worked with her and could not verify the authenticity of the data she relied on.**
   - *See* Part (I) A, *supra*.
   - *See* Hearing Tr. (Sept. 14, 2021), at 77:14-83:11.

C. **Kwon's analysis of limited "claim's rates" cannot be extrapolated to a "defect rate" as used by Dr. Hanssens or Dr. Cantor in their reports.**
   - Hearing Tr. (Sept. 14, 2021), at 100:2-100:15 ("It's not a sample… I am analyzing a population, a universe of all available warranty claims and safety-related fire claims… It's a complete population… I don't know what you would extrapolate it to.").
   - Pls.' Reply Mot. Exclude, at p. 7-8.

D. **Kwon's improper analysis is evidenced by the nearly doubled "claims rate" between reports attempting to ascertain the same "claims rate."**
   - Pls.' Mot. to Exclude, at p. 17; Pls.' Reply Mot. to Exclude, at p. 4.
   - *See* Hearing Tr. (Sept. 14, 2021), at 95:5-96:8.

E. **Kwon should be excluded because she is not qualified to provide statistical analysis.**
   - Kwon has no engineering, statistics, mathematics background and rendering her opinions on statistical incidence rates relied on by Dometic's other experts inadmissible.
   - *See* Hearing Tr. (Sept. 14, 2021), at 72:11-23.
   - *See also*, Pls.' Mot. to Exclude, at pp. 16-17.

F. **Kwon should be excluded because she conducted no analysis of the alleged defect.**

- Kwon has only rudimentary understanding of defect alleged and the time frame in which the defect could allegedly manifest, and her analysis is constrained by her incorrect assumptions on this point.
- *See* Hearing Tr. (Sept. 14, 2021), at 74:2-20, 75:13-19.
- Kwon Dep. (I), at 31; Kwon Dep. (II), at 28.
- *See* Pls.' Mot. to Exclude, at p. 18-19 (noting "cooling units generally do not breach and actually leak flammable gas until years have elapsed" which is significant because the vast majority of failures can be expected to occur outside the recorded warranty period) (citing AEGI Report at 6-8, 16-4, 29-30; AEGI Rebuttal Report at 3-8).

### III. DR. HANSSENS SHOULD BE EXCLUDED BECAUSE HE OMITTED CRITICAL AND MATERIAL INFORMATION FROM HIS ANALYSIS OF THE EXPOSURE SURVEY.

**A. Relying solely on Kwon's flawed analysis, Dr. Hanssens improperly extrapolated her underreported warranty and insurance "claims rate" to a "defect rate" that he presented in the survey test brochure to test the materiality of the disclosure.**

- The "defect rate" Hanssens presented in his survey was not a calculated "defect rate" reflecting any true "fire safety risk" by way of statistical sample or other methodology but instead a limited analysis of underreported warranty and insurance claims. *See* Part I (C), *supra*; Hearing Tr. (Sept. 14, 2021), at 100:7.
- Kwon admitted that her data could not be extrapolated to any population beyond the claims she actually measured: warranty and insurance claims, yet Hanssens did not consider that in using it to represent an entirely different measure—*i.e.*, a defect rate reflecting the "fire safety risk" in his survey. *See* Part I (C), *supra*; *Compare*, Hanssens Report at ¶ 51, *with* Hearing Tr. (Sept. 14, 2021), at 100:2-18; 117:17-20.

**B. Dr. Hanssens admitted if the "defect rate" figure presented was incorrect then the materiality survey based on the disclosure should have been rerun and it was not.**

- *See* Hanssens Tr. at 41:3-43:2; 207:22-209:25, 294:14-295:3.
- Even if the claims rate derived by Kwon could be extrapolated to a "defect rate"—which it cannot be, *see* Part II (A), *supra*—it did not account for claims that went unrecorded and is thus significantly lower than what reality dictates, distorting the survey's results. *See* Part I (A)-(C), *supra*.
- Further, Kwon's second attempt to ascertain a claims rate resulted in a figure nearly double that originally derived, but Hanssens did not account for this. *See* Part I (D),

7

*supra*.

- While at the September 14 hearing, Dr. Hanssens attempted to walk back his prior deposition testimony and claim that only "seriously off" defect rate figures warrant re-running the survey with an updated rate (*see* Hearing Tr. (Sept. 14, 2021), at 113:23-115:25, 117:7-20), his newly adopted conclusion lacks foundation. What is evident based on Kwon's figures and report is that no one knows what the true incident rate of leaks and fires actually is and how "off" the figures Dr. Hanssens used in his survey to represent the "fire safety risk" are rendering the figures used meaningless and Dr. Hanssens' admission that a new figure would require a new study dispositive. *See* Pls.' Reply Mot. Exclude at pp. 4-5. Dr. Hanssens simply has no basis to conclude that the threshold difference for re-running the survey with an accurate defect rate is not met.

C. **Dr. Hanssens manipulated the brochure he provided to his survey respondents to minimize attention drawn to the "defect rate" and refrigerators in general.**

- Dr. Hanssens removed photographs from the test brochures that included refrigerator options (i.e., a compressor refrigerator option). Rather than deleting the refrigerator picture he could have put the warning where consumers were logically considering refrigerator options. *See* Hearing Tr. (Sept. 14, 2021), at 107:10-108:22). While Dr. Hanssens indicated that he removed the compressor refrigerator picture on the brochure (on page 11) to leave "space for the disclosures," this is disingenuous as the tested disclosures were on an entirely different page (on page 9). *See* Hearing Tr. at 106:4-22; Hanssens Report at ¶ 51, n.73

- Dr. Hanssens instead buried the tested warning in a footnote in the middle of the brochure with indistinguishable font. *See* Hearing Tr. (Sept. 14, 2021), at 109:7-19.

- Dr. Hanssens could easily have made the disclosure more conspicuous but chose not to. Pls.' Reply Mot. Exclude, at p. 10 (citing Hanssens Tr. at 146:24-147:17, 191:8-13, 129:6-12).

D. **Dr. Hanssens methodologies failed to use basic survey principles rendering them inadmissible.**

- Dr. Hanssens' survey failed to account for any biases in survey design or use a manipulation check. *See* Pls.' Mot. to Exclude at 22-23; Hearing Tr. (Sept. 14, 2021), at 111:20-112:5, 113:8-18.

- The sample size used by Dr. Hanssens was too small to draw any statistically significant

8

conclusions. *See* Pls.' Mot. to Exclude at 22.

### IV. DR. CANTOR SHOULD BE PARTIALLY EXCLUDED BECAUSE HER CONCLUSION THAT THE SAFETY RISK DR. GLASGOW INVESTIGATED WAS A "LOW PROBABILITY EVENT" WAS BASED ON AN INCOMPLETE AND NON-EXISTENT DATA SET AND THUS, IS UNRELIABLE.

- *See* Part I (A)-(D), *supra.* Dr. Cantor never considered testimony of Chris Jackson, Barb Wagner, or RV Dealers such as Brian Quinn or Doug Lown confirming that not all incidents of leaks and fires were not reported and recorded in any database that Kwon analyzed. Hearing Tr. (Sept. 14, 2021), at 130;24; 131:21-22; 134:13-135:10.

- Hearing Tr. (Sept. 14, 2021), at 134:20-135:15 (confirming she did not consider any testimony from Chris Jackson describing incomplete claims records and instead relied on "logic" to assume that "if there was some very large set of claims that had not been counted in the database, then plaintiffs would have proffered those claims.").Dr. Cantor admits her understanding of the "low-probability" critique is based solely on Kwon's analysis; because Kwon's testimony should be excluded so should this portion of Dr. Cantor's opinion.

- *See* Hearing Tr. (Sept. 14, 2021), at 125:17-20, 126:7-24 (regarding the chart title "safety-related fire claims rate," admitting the sole source of the data for that table, and how she determined that the "rate of safety-related fire claims is very small" is from Kwon's report).

- Hearing Tr. (Sept. 14, 2021), at 133:13-17 (from the Court "Dr. Cantor kindly answered my question, which was a very direct question, her table that talks about low probability is based exclusively on the source material from Ms. Kwon. So, she did not consider anything else, from my understanding of her answer, to formulate that opinion.").

- Random, undisclosed internet searches that Dr. Cantor claims to have conducted to assist in her understanding of the "low-probability event" do not provide statistically significant data to support any conclusion that the safety risk Dr. Glasgow investigated was a "low probability event." Hearing Tr. (Sept. 14, 2021), at 135:22-137:1.

Respectfully submitted this 24th day of September 2021.

*/s/ Adam Moskowitz*

| | |
|---|---|
| **THE MOSKOWITZ LAW FIRM, PLLC**<br>Adam Moskowitz<br>Florida Bar No. 984280<br>Howard M. Bushman<br>Florida Bar No. 0364230<br>Joseph M. Kaye<br>Florida Bar No. 117520<br>2 Alhambra Plaza, Suite 601<br>Coral Gables, FL 33134<br>Telephone: (305) 740-1423<br>Email: howard@moskowitz-law.com<br>Email: adam@moskowitz-law.com<br>Email: joseph@moskowitz-law.com<br>Secondary: dione@moskowitz-law.com<br>Secondary: rejane@moskowitz-law.com<br><br>*Co-counsel for Plaintiffs* | **ZIMMERMAN REED, LLP**<br>Hart L. Robinovitch (admitted pro hac vice)<br>14646 N. Kierland Blvd., Suite 145<br>Scottsdale, AZ 85254<br>(480) 348-6400 Telephone<br>(480) 348-6415 Facsimile<br>Email: hart.robinovitch@zimmreed.com<br><br>Caleb Marker (admitted pro hac vice)<br>2381 Rosecrans Ave., #328<br>Manhattan Beach, CA 90245<br>(877) 500-8780 Telephone<br>(877) 500-8781 Facsimile<br>Email: caleb.marker@zimmreed.com<br><br>*Co-counsel for Plaintiffs* |
| **SEARCY DENNEY SCAROLA BARNHART & SHIPLEY PA**<br>Jack Scarola, Esq.<br>Florida Bar No. 169440<br>2139 Palm Beach Lakes Blvd.<br>West Palm Beach, FL 33409<br>Telephone: (561) 686-6300<br>Fax: (561) 383-9451<br>Email: jsx@searcylaw.com<br><br>*Co-counsel for Plaintiffs* | **HAGENS BERMAN SOBOL SHAPIRO LLP**<br>Thomas E. Loeser (admitted pro hac vice)<br>Barbara Mahoney (admitted pro hac vice)<br>1918 Eighth Avenue, Suite 3300<br>Seattle, WA 98101<br>Telephone: (206) 623-7292<br>Email: toml@hbsslaw.com<br>Email: barbara@hbsslaw.com<br><br>*Co-counsel for Plaintiffs* |
| **LAW OFFICES OF TERRENCE A. BEARD**<br>Terrence A. Beard (admitted pro hac vice)<br>525 Marina Blvd<br>Pittsburg, CA 94565<br>Telephone: (925) 778-1060<br>Facsimile: (925) 473-9098<br>Email: TBeard1053@aol.com<br><br>*Co-counsel for Plaintiffs* | |

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on September 24, 2021, I electronically filed the foregoing with the Clerk of the Court for the United States District Court for the Southern District of Florida by using the CM/ECF system, which sent notification of such filing to all CM/ECF participants.

By: /s/ *Adam M. Moskowitz*
Adam M. Moskowitz