UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-22482-CIV-SCOLA/OTAZO-REYES

BRANDY VARNER, *et al.*,
and all others similarly situated,

      Plaintiffs,

v.

DOMETIC CORPORATION, a Delaware
Corporation,

      Defendant.
_____/

## ORDER ON *DAUBERT* MOTION [D.E. 380]

THIS CAUSE came before the Court upon Defendant Dometic Corporation's ("Defendant" or "Dometic") Motion to Exclude the Opinions of AEGI and Dr. Garret Glasgow (hereafter, "*Daubert* Motion") [D.E. 380].[1] This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 by the Honorable Robert N. Scola, Jr., United States District Judge [D.E. 410]. The undersigned held an evidentiary hearing on this matter on September 13 and 14, 2021 (hereafter, "*Daubert* Hearing") [D.E. 527 & 528]. Thereafter, pursuant to the undersigned's instructions, Defendant submitted a post-hearing supplemental brief. See Defendant's Closing Brief in Support of Its Motion to Exclude the Opinions of AEGI and Garrett Glasgow (hereafter, "Defendant's Post-Hearing Brief") [D.E. 541].

Having considered the parties' written submissions and having heard the testimony of Plaintiffs' experts at the *Daubert* Hearing, the undersigned GRANTS Defendant's *Daubert* Motion [D.E. 380].

---

[1] AEGI stands for Applications Engineering Group, Inc. See AEGI's Federal Rule 26 Expert Report (hereafter, "AEGI Expert Report") [D.E. 380-1].

## PROCEDURAL AND FACTUAL BACKGROUND

On September 27, 2018, Plaintiffs filed their Consolidated Class Action Complaint alleging products liability and related claims against Defendant in connection with its gas absorption refrigerators used in recreational vehicles ("RVs"). See Compl. [D.E. 300]. Plaintiffs allege that Defendant's refrigerators suffer from design defects that create risks of gas leakages and/or fires; and that Defendant concealed those alleged defects. Id. Plaintiffs have proffered the AEGI Expert Report, which was authored by AEGI representatives Orion Keifer and Peter Layson (together, "AEGI Representatives"), and the Expert Report of Dr. Garrett Glasgow ("Dr. Glasgow's Expert Report") in support of their Motion for Class Certification [D.E. 345 (filed under seal)].

In their Expert Report, the AEGI Representatives proffered the following opinions: (1) all Dometic gas absorption refrigerators manufactured since 1997 share the same design defect in the boiler tube; (2) the design defect caused corrosion-induced leaks upon first use by consumers; and (3) the design defect is the common cause of the fires experienced by each of the Plaintiffs. See AEGI Expert Report [D.E. 380-1 at 6–8].[2]

In his Expert Report, Dr. Glasgow proffered the following opinions: (1) if Dometic refrigerators had carried a fire warning label, demand for those refrigerators would have substantially declined; (2) the price for Dometic refrigerators with a fire warning would have been 5.4% lower than the prices consumers actually paid; and (3) a 5.4% overcharge could be applied on a class wide basis to calculate damages. See Dr. Glasgow's Expert Report [D.E. 380-2 at 3–5, 44].[3]

---

[2] The page citations [D.E. 380-1 at __] are to the report pages rather than the court record pages.
[3] The page citations [D.E. 380-2 at __] are to the report pages rather than the court record pages.

## *DAUBERT* STANDARDS

Rule 702 of the Federal Rules of Evidence (hereafter, "Rule 702") provides:

A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A party who seeks to admit expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). Thus, before expert testimony may be admitted as evidence at trial pursuant to Rule 702, the district court must act as a gatekeeper and screen the proffered evidence. Daubert, 509 U.S. at 596–97. In the Eleventh Circuit, this gatekeeping function must be performed as follows:

[I]n determining the admissibility of expert testimony under Rule 702, [the court must] engage in a rigorous three-part inquiry [and] must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). "A district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison, 184 F.3d at 1311). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the

burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)). "Rejection of an expert's testimony is the exception rather than the rule . . . ." Adega v. State Farm Fire & Cas. Ins. Co., No. 07-CV-20696, 2010 WL 11506354, at *1 (S.D. Fla. 2010).

## DISCUSSION

### 1. AEGI

Defendant argues that the opinions in the AEGI Expert Report should be excluded under *Daubert* because: the methodology utilized by the AIG Representatives does not comport with the scientific method; the AEGI Representatives did not conduct any testing to validate their design defect theory; and the opinion that Dometic refrigerators pose a fire safety risk lacks any reliable basis. See Def.'s Post-Hearing Brief [D.E. 541 at 1–7]; *Daubert* Motion [D.E. 380 at 3–16].

With regard to sample selection, Defendant argues that the sample size of 14 cooling units in the AEGI Expert Report is unrepresentative of the larger population of Dometic refrigerators and is far too small in relation to the millions of cooling units made by Dometic.[4] See *Daubert* Motion [D.E 380 at 8–9].

AEGI limited its testing to the cooling units in 14 Dometic gas absorption refrigerators ranging in age from 2 to 16 years, 13 of which had already been part of an RV fire and 1 of which had allegedly leaked. See AEGI Expert Report [D.E. 380-1 at 10–16]; see also Transcript of September 13, 2021 Hearing (hereafter, "9/13 Tr.") [D.E. 535 at 62–65, 103]. Thus, none of the 14 sample cooling units were operational at the time of testing. See id. Courts have repeatedly recognized that using already-failed products to argue that a class-wide defect exists is

---

[4] Plaintiffs' Opposition to Dometic's *Daubert* Motion ("Opposition") generally argues that the expert opinions of the AEGI Representatives should be admitted because Defendant's arguments go to the weight of the opinion, not admissibility. See Opposition [D.E. 396 (filed under seal)].

methodologically unsound.  See, e.g., In re Hardieplank Fiber Cement Siding Litig., No. 12-md-2539, 2018 WL 262826, at *9 (D. Minn. Jan. 2, 2018) (finding expert's methodology unreliable where he "cherry picked" "6 used samples, all from Plaintiffs claiming defects", did not test any samples from non-plaintiffs, and improperly opined the 6 samples were representative of the billions defendant's products); Brown v. Electrolux Home Prod., Inc., 2017 WL 2952281, at *4 (S.D. Ga. July 10, 2017) (excluding expert opinion because it was based on products that already "have problems" and thus, was improperly "based on a selective sample"); Allgood v. Gen Mot. Corp., No. 102CV1077, 2006 WL 2669337, at *11 (S.D. Ind. Sept. 18, 2006) ("[S]amples must be chosen using some method that assures the samples are appropriately representative of the larger entity or population being measured."); In re Pella Corp., 214 F. Supp. 3d 478, 493 (D.S.C. 2016) (testing products "that already exhibited signs of damage . . . overstate[d] the likelihood of [product] failure in the overall population.").  Moreover, the use of a sample size consisting of only 14 cooling units in relation to millions of cooling units made by Dometic is also problematic.  See, e.g., In re Pella Corp., 214 F. Supp. 3d at 491 (testing 477 windows was insufficient to conclude that 7.5 million windows shared a common defect); Groditzky v. Am. Honda Motor Co., 2017 WL 8943159, at *4 (C.D. Cal. Oct. 30, 2017) (examination of 26 window regulators could not show common defect among 441,600 products in class).  Applying these principles, the undersigned concludes that the AEGI Representatives' reliance on a small sample of already-failed cooling units to show a common defect among an exponentially larger population of cooling units renders their methodology insufficiently reliable under Daubert.

As previously noted, the AEGI Representatives analyzed 13 cooling units that had been part of an RV fire and 1 that had allegedly leaked.  See AEGI Expert Report [D.E. 380-1 at 10–16, 18–19]; see also 9/13 Tr. [D.E. 535 at 62–65].  From studying these already-damaged units,

the AEGI Representatives hypothesized that the alleged design defect in the boiler tube caused "excess corrosion" and corrosion-induced leaks, whose root causes were cyclic thermal stresses caused by a concentration of heat at the boiler tube in the cooling unit. See AEGI Expert Report [D.E. 380-1 at 20–21]. However, the AEGI Representatives never sought to validate this hypothesis by actually testing the stress levels in any of Dometic's cooling units, testing the rate of corrosion in Dometic refrigerators, or conducting any sort of accelerated corrosion testing. See 9/13 Tr. [D.E. 535 at 62]. Nor did the AEGI Representatives test any new or used operational units or attempt to gather any empirical data to evaluate how long the "excess corrosion" process would take to cause a Dometic refrigerator to fail. See id. at 63 & 103: 8–13. Instead, the AEGI Representatives "looked at many, many of these cooling units, and [saw] the damage that is indicative of what our opinions are." See id. Such backtracking fails to comport with scientific testing standards. See Fireman's Fund Ins. Co. v. Tecumseh Prods. Co., 767 F. Supp. 2d 549, 555 (D. Md. 2011) ("It should be obvious that no set of observations can serve both to generate and to test the same hypothesis."); In re Denture Cream Prods. Liab. Litig., No. 09-2051, 2015 WL 392021, at *25 n.37 (S.D. Fla. Jan. 28, 2015) ("after-the-fact attempt to bolster [the expert's] opinion does not instill confidence in [his] methodology."); see also Daubert, 509 U.S. at 593 (the scientific method requires "generating hypotheses and testing them to see if they can be falsified.").

Moreover, the AEGI Representatives did not test a single cooling unit upon first use and did not observe corrosion damage on a single Dometic cooling unit immediately after first use. Further, with regard to their opinion that Dometic cooling units cause a "substantial risk of fire", the AEGI Representatives did not test any Dometic cooling units that had been retrofitted with a metal heat shielding intended to prevent any potential fire safety risk. See 9/13 Tr. [D.E. 535 at 97:19–21, 117, 182, 179]. Rather, they relied on their general knowledge and experience

regarding "boiler systems" that have "been an issue of study for over 150 years since the invention of the steam engine" and provided a laundry list of "feasible, non-exclusive repair options" that was not specific to the mechanics of Dometic cooling units. See AEGI Expert Report [D.E. 380-1 at 24]; see also 9/13 Tr. [D.E. 535 at 102:19–21]. However, relying simply on broad principles of engineering has "little value" under *Daubert*. McClain v. Metabolife Intern., Inc., 401 F.3d 1233, 1244 (11th Cir. 2005) (excluding expert opinion that was based on "'broad principles of pharmacology'" because "such phrases have little value" under *Daubert*).

Based on the foregoing considerations, the undersigned concludes that the expert opinions of the AEGI Representatives, as contained in the AEGI Expert Report, are not admissible under *Daubert.*

### 2. Dr. Glasgow

Defendant argues that Dr. Glasgow's expert testimony should be excluded under *Daubert* because: he surveyed the wrong population and evaluated demand for the wrong product; his market simulation is methodologically unsound because it is based on flawed inputs; and his class-wide damages opinion is unreliable. See Def.'s Post-Hearing Brief [D.E. 541 at 8–11; see also *Daubert* Motion [D.E. 380 at 17–22, 24].

In forming his opinion that demand for Dometic refrigerators would have substantially declined had they included a fire warning label, Dr. Glasgow conducted a choice-based survey, known as a "conjoint analysis", to individuals who owned a recreational vehicle with a refrigerator, or "who were in the market for a recreational vehicle or a refrigerator for a recreational vehicle." See Dr. Glasgow's Expert Report [D.E. 380-2 at 9, 11–13].[5] A total of 626 respondents completed the survey, which included a "Test Group" that was shown a hypothetical fire warning

---

[5] A conjoint analysis is "an analytic survey method used to measure customer preferences for specific features of products". Sanchez-Knutson v. Ford Motor Co., 310 F.R.D. 529, 538–89 (S.D. Fla. 2015).

regarding gas absorption refrigerators and a "Control Group" that was not shown a warning. Id. at 15–17, 23–27. Dr. Glasgow estimated the extent a given attribute of an RV refrigerator, such as a hypothetical fire warning, would have on respondents' likelihood of choosing a given refrigerator by creating coefficients. Id. at 29–30. He then used these coefficients to create an estimated reduction in consumer willingness to pay ("WTP") for gas absorption refrigerators with a hypothetical fire warning and concluded that, if Dometic refrigerators had carried a fire warning label, demand for those refrigerators would have substantially declined. Id. at 31–33.

Next, Dr. Glasgow estimated how Dometic would purportedly respond to a change in demand for their refrigerators by creating a "market simulation" measuring a supply-side reduction of Dometic refrigerators. Id. at 36–42. To do this, he relied on three "inputs": (1) the average price for all Dometic refrigerators; (2) the marginal cost of production for Dometic refrigerators and gas absorption refrigerators made by its competitor, Norcold; and (3) relative market shares of Dometic, Norcold, and an "outside option" for refrigerators. Id. at 33–44]; Dep. of Dr. Glasgow [D.E. 380-18 at 243–244]. From these inputs, Dr. Glasgow concluded that the price for Dometic refrigerators with a fire warning would have been 5.4% lower than the prices consumers actually paid. See Dr. Glasgow Expert Report [D.E. 380-2 at 36–42]. Dr. Glasgow then applied this 5.4% price reduction to the total amount consumers spent on Dometic gas absorption refrigerators nationally from 2013–2016 to calculate total class-wide damages of $24,730,245. Id. at 42–43.

With respect to Dr. Glasgow's population selection, he conceded at the *Daubert* Hearing that he was aware at the time of conducting his choice-based survey that Defendant "sells all of its refrigerators directly to either original equipment manufacturers or OEMs, and RV dealers" and "does not sell any of its gas-absorption refrigerators directly to consumers", but that he "nevertheless, surveyed a population of consumers." See Transcript of September 14, 2021

Hearing (hereafter, "9/14 Tr.") [D.E. 531 at 12]. However, by excluding manufacturers from his survey, Dr. Glasgow failed to "identify a representative sample of those who buy Defendant's products", which in turn, "significantly undermines the relevance of [his] survey." See In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig., 2017 WL 1196990, at *29 (N.D. Ill. Mar. 21, 2017) (excluding plaintiffs' survey because it was administered to consumers rather than the defendants' real-world buyers of wholesalers); see also Hi Ltd. P'Ship v. Winghouse of Fla. Inc., 2004 WL 5486964, at *8 (M.D. Fla. Oct. 5, 2004) ("Most significantly, the failure to include a single female in the survey, when women compromise nearly a third of Hooters' customer base and perhaps even more of Winghouse's clientele, reflects a patently flawed methodology striking at the very heart of the survey's validity."). Because he surveyed the wrong population, Dr. Glasgow's conjoint analysis is subject to exclusion under *Daubert*.

With respect to his product demand evaluation, Dr. Glasgow tested demand for standalone Dometic refrigerators by including the consumer choice of purchasing gas absorption refrigerators or compressor refrigerators in RVs. See Dr. Glasgow Expert Report [D.E. 380-2 at 17–19, 21]. However, Dometic consumers typically are not given a choice of which refrigerator to have installed in their RVs and compressor refrigerators are not widely available for installation in RVs. See Dep. of Dr. Glasgow [D.E. 380-18 at 20:15–24, 24:8–25, 39:7–23, 246:5–8] (conceding that "I've seen no evidence . . . that suggests that any compressor refrigerator manufacturer was moving into the RV market."). Thus, Dr. Glasgow's survey failed to reflect the way consumers view Dometic refrigerators in the real-world marketplace. See Native Am. Arts, Inc. v. Bud K World Wide, Inc., 2012 WL 1833877, at *6 (M.D. Ga. May 18, 2012) ("In order to be considered reliable, a survey must resemble the way consumers would view the products in the marketplace."). Due to this further flaw, Dr. Glasgow's conjoint analysis is subject to exclusion under *Daubert*.

9

With respect to his market simulation, Dr. Glasgow estimated the average prices for all Dometic refrigerators by relying on suggested retail pricing of Dometic refrigerators provided to RV dealers in "aftermarket sales", which would occur when a consumer purchases a new refrigerator to replace the old one in their RV. See Dr. Glasgow Expert Report [D.E. 380-2 at 39–40]. Dr. Glasgow did not analyze Defendant's OEM pricing, which he acknowledged make up the vast majority of Defendant's sales. See Dep. of Dr. Glasgow [D.E. 380-18 at 220, 222, & 263]; see also 9/14 Tr. [D.E. 531 at 12]. Indeed, Dr. Glasgow conceded at the Daubert hearing that he did not "look at Dometic's pricing that applie[d] to the vast majority of its transactions in the real world" but relied exclusively on consumer pricing derived solely from dealer lists. See Sealed Transcript of September 14, 2021 Hearing [D.E. 534 at 48 (filed under seal)].[6] Because his market simulation excluded Defendant's primary consumers, namely manufacturers of RVs, it warrants the exclusion of his expert testimony. See e.g., Barber v. United Airlines, Inc., 17 Fed.Appx. 433, 437 (7th Cir. 2001) ("Because in formulating his opinion Dr. Hynes cherry-picked the facts he considered to render an expert opinion, the district court correctly barred his testimony because such a selective use of facts fails to satisfy the scientific method and Daubert, and it thus fails to 'assist the trier of fact.'").

Moreover, for his market simulation, Dr. Glasgow used outdated data from a ten-year old study about production costs for home refrigerators. This approach undermines the reliability of his methodology for determining current production costs for RV refrigerators. See, e.g., Amorgianos v. Nat'l R.R. Passenger Corp., 303 F.3d 256, 270 (2d Cir. 2002) (district court did not abuse discretion in excluding expert testimony "upon reasonably concluding that the gap

---

[6] Although this portion of the transcript was filed under seal, the quoted passage does not disclose any confidential information.

between the studies on which [the expert] relied and her conclusions was simply too great and that her opinion was thus unreliable."); Marcel v. Placid Oil Co., 11 F.3d 563, 567–68 (5th Cir. 1994) (excluding expert opinion that was based upon "outdated, statistically suspect, and untrustworthy" study); McGlinchy v. Shell Chem. Co., 845 F.2d 802, 807 (9th Cir. 1988) (finding a study "hopelessly flawed" where the expert witness "did not confirm that relevant market conditions were the same before and after the time the injury was alleged to have occurred"). This flaw in methodology further supports excluding Dr. Glasgow's expert opinion. See Winn-Dixie Stores, Inc. v. Dolgencorp, LLC, 862 F. Supp. 2d 1322, 133 (S.D. Fla. 2012) (expert opinion that relied on 2009 and 2010 data to calculate damages from 2005 through 2008 was excluded as a "leap of faith" condemned by *Daubert*).

Finally, Dr. Glasgow's market simulation relied on markup ratios for sales to the wrong population—that is, from dealer-to-consumer rather than manufacturer-to-dealer—and Dr. Glasgow assumed, without any basis, that both markup ratios were the same across these industries. See Dep. of Dr. Glasgow [D.E. 380-18 at 283:15–21] ("Q. Might it be the case that Dometic has very different markup ratios as between sales to OEMs and sales to dealers? A. I don't have any information on that one way or another. I think Dometic certainly has that information, and I could consider it in a market simulation, if need be."). See Rink v. Cheminova, Inc., 400 F.3d 1286, 1292 (11th Cir. 2005) ("Transposition of data based on such conjecture and rough approximation lacks the 'intellectual rigor' required by *Daubert*.") (citation omitted).

Because Dr. Glasgow relied on unreliable conjoint analysis and market simulation methodologies to calculate class-wide damages, his proposed expert opinion is subject to exclusion under *Daubert*. See In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig., 2017 WL 1196990, at *31 ("Asking an unrepresentative group of purchasers to artificially assign values

11

among an arrangement of potentially unimportant attributes that fails to approximate real-world purchasing decisions does not seem designed to produce a reliable WTP estimate that can be used to calculate class-wide damages.").

## CONCLUSION

Based on the foregoing considerations, it is

ORDERED AND ADJUDGED that Defendant's *Daubert* Motion [D.E. 380] is GRANTED.

DONE AND ORDERED in Chambers at Miami, Florida, this 2nd day of February, 2022.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc: United States District Judge Robert N. Scola
 Counsel of Record