UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO.: 16-22482-CIV-SCOLA/OTAZO-REYES

BRANDY VARNER, *et al.*,
and all others similarly situated,

    Plaintiffs,

v.

DOMETIC CORPORATION, a Delaware
Corporation,

    Defendant.
_____/

**ORDER ON *DAUBERT* MOTION [D.E. 395][1]**

THIS CAUSE came before the Court upon Plaintiffs Brandy Varner, *et al.*'s ("Plaintiffs") Motion to exclude the opinions of Defendant Dometic Corporation's ("Defendant" or "Dometic") experts Dr. Amy Gray ("Dr. Gray"), Sonya Kwon ("Ms. Kwon"), and Dr. Dominique Hanssens ("Dr. Hanssens"); and to partially exclude the opinion of Dr. Robin Cantor ("Dr. Cantor") (hereafter, "*Daubert* Motion") [D.E. 395 (filed under seal)]. This matter was referred to the undersigned pursuant to 28 U.S.C. § 636 by the Honorable Robert N. Scola, Jr., United States District Judge [D.E. 408]. The undersigned held an evidentiary hearing on this matter on September 13 and 14, 2021 (hereafter, "*Daubert* Hearing") [D.E. 527 & 528]. Thereafter, pursuant to the undersigned's instructions, Plaintiffs submitted a post-hearing supplemental brief. See Plaintiffs' Summary of *Daubert* Challenges (hereafter, "Plaintiffs' Post-Hearing Brief") [D.E. 542].

---

[1] Plaintiffs' initial *Daubert* Motion was filed at D.E. 389. Thereafter, Plaintiffs were granted leave to file excess pages, see Order granting Plaintiffs' Unopposed Renewed Motion for Leave to File Excess Pages [D.E. 394], and refiled their *Daubert* Motion at D.E. 395. Therefore, D.E. 389 is DENIED as moot.

Having considered the parties' written submissions and having heard the testimony of Defendant's experts at the *Daubert* Hearing, the undersigned GRANTS IN PART and DENIES IN PART Plaintiffs' *Daubert* Motion.

## **PROCEDURAL AND FACTUAL BACKGROUND**

On September 27, 2018, Plaintiffs filed their Consolidated Class Action Complaint, asserting products liability and related claims against Dometic in connection with its gas absorption refrigerators used in recreational vehicles ("RVs"). See Compl. [D.E. 300]. Plaintiffs allege that Dometic's refrigerators suffer from design defects that create risks of gas leakages and/or fires; and that Dometic concealed those alleged defects. Id. To rebut Plaintiffs' claims, and in support of its Opposition to Plaintiff's Motion for Class Certification [D.E. 373 (filed under seal)], Dometic has proffered: Dr. Gray's Expert Report [D.E. 373-4 (filed under seal)]; Ms. Kwon's Expert Report [D.E. 373-16 (filed under seal)]; Dr. Hanssens' Expert Report [D.E. 373-36 (filed under seal)]; and Dr. Cantor's Expert Report [D.E. 373-24 (filed under seal)].[2]

Dr. Gray's Expert Report proffered the following opinions: (1) the recall Secondary Burner Housing ("SBH") kits in Dometic's cooling units achieved the intended function of preventing fires by containing any flames from a leaking boiler tube within the cooling unit; and (2) there is no scientific basis to support the opinions of Plaintiffs' expert, Applications for Engineering Group, Inc. ("AEGI"), that Dometic's cooling units allowed ammonia to migrate into an RV cabin at high enough levels to cause a fire. See Dr. Gray's Expert Report [D.E. 373-4 at 5, 19, 21–22]; see also Transcript of September 13, 2021, Hearing (hereafter, "9/13 Tr.") [D.E. 535 at 224, 227–28, 244–46].

Ms. Kwon's Expert Report analyzed the incidence of Safety-Related Fire Claims and

---

[2] Although these Expert Reports were filed under seal, the undersigned is only disclosing publicly available information in this *Daubert* Order.

Warranty Claims for Dometic refrigerators retrofitted with the recall SBH kit and proffered the following opinions: (1) there is a statistically significant difference and decline in the cooling unit warranty claims rate on post-recall Dometic refrigerators compared to recalled refrigerators; (2) fire claims declined among Dometic refrigerators retrofitted with the SBH recall kit as compared to those that did not receive a recall kit; (3) there is no statistical significance in the Safety-Related Fire Claims rate on non-recalled refrigerators as compared to refrigerators with a factory-installed recall kit; and (4) the claims rate on cooling units manufactured by the brand JC Refrigeration is significantly higher than the cooling unit claims rate on Dometic-branded refrigerators.  See Ms. Kwon's Expert Report [D.E. 373-16 at 12, 19, 25, 28, 30]; see also Transcript of September 14, 2021 Hearing (hereafter, "9/14 Tr.") [D.E. 531 at 76–77, 101–02].

Dr. Cantor's Expert Report relies on Ms. Kwon's Expert Report to proffer an opinion that the safety risk investigated by Plaintiffs' consumer survey expert, Dr. Garett Glasgow ("Dr. Glasgow"), was a "low probability event".  See Dr. Cantor's Expert Report [D.E. 373-24 at 12–13]; see also 9/14 Tr. [D.E. 531 at 131–133].

Dr. Hanssens' Expert Report, which is based on the results of a consumer survey he conducted, proffered the following opinion: even if Dometic had disclosed the safety risks of its allegedly defective refrigerators, such a disclosure would not have had a statistically significant effect on the purchasing decisions of most consumers because the majority of consumers do not review any written material prior to purchasing an RV; and even if consumers had learned of the alleged defect, they would have been indifferent.  See Dr. Hanssens' Expert Report [D.E. 373-16 at 7, 32]; see also 9/14 Tr. [D.E. 531 at 109–11].

## *DAUBERT* STANDARDS

Rule 702 of the Federal Rules of Evidence (hereafter, "Rule 702") provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b) the testimony is based on sufficient facts or data;
>
> (c) the testimony is the product of reliable principles and methods; and
>
> (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. A party who seeks to admit expert testimony bears the burden of laying the proper foundation for its admissibility by a preponderance of the evidence. Allison v. McGhan Med. Corp., 184 F.3d 1300, 1306 (11th Cir. 1999). Thus, before expert testimony may be admitted as evidence at trial pursuant to Rule 702, the district court must act as a gatekeeper and screen the proffered evidence. Daubert, 509 U.S. at 596–97. In the Eleventh Circuit, this gatekeeping function must be performed as follows:

> [I]n determining the admissibility of expert testimony under Rule 702, [the court must] engage in a rigorous three-part inquiry [and] must consider whether: (1) the expert is qualified to testify competently regarding the matters he intends to address; (2) the methodology by which the expert reaches his conclusions is sufficiently reliable as determined by the sort of inquiry mandated in *Daubert*; and (3) the testimony assists the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue.

United States v. Frazier, 387 F.3d 1244, 1260 (11th Cir. 2004) (citing City of Tuscaloosa v. Harcros Chems., Inc., 158 F.3d 548, 562 (11th Cir. 1998)). "A district court's gatekeeper role under *Daubert* 'is not intended to supplant the adversary system or the role of the jury.'" Maiz v. Virani, 253 F.3d 641, 666 (11th Cir. 2001) (quoting Allison, 184 F.3d at 1311). Rather, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." Daubert, 509 U.S. at 596 (citing Rock v. Arkansas, 483 U.S. 44, 61 (1987)). "Rejection

4

of an expert's testimony is the exception rather than the rule . . . ." Adega v. State Farm Fire & Cas. Ins. Co., No. 07-CV-20696, 2010 WL 11506354, at *1 (S.D. Fla. 2010).

## DISCUSSION

### 1. *Dr. Gray*

Defendant argues that the opinions in Dr. Gray's Expert Report should be excluded under *Daubert* because: she is not qualified to render an opinion in the areas of gas absorption technology or boiler theory; and the methodology she used is unreliable because it was not based on engineering principles. See Plfs.' Post-Hearing Brief [D.E. 542 at 1–2]; *Daubert* Motion [D.E. 395 at1, 9–10].

With regard to Dr. Gray's qualifications, Plaintiffs contend that Dr. Gray has insufficient training, education, or experience to competently render opinions on the operation and failure of gas absorption refrigerators. See Plfs.' Post-Hearing Brief [D.E. 542 at 1–2]. Although Dr. Gray is a mechanical engineer specializing in thermal-fluid sciences and combustion, at the *Daubert* Hearing, she conceded that she had no experience with gas absorption refrigerators or specific training or education in boiler theory, boiler design, boiler operation or boiler failure prior to being retained in this case. See 9/13 Tr. [D.E. 535 at 212–13]. Moreover, Dr. Gray acknowledged that she did not consult with outside engineering firms with more experience in the field of boiler theory to verify the information Dometic provided to her or her own test results; and that she did not review the work of Dometic's expert, Dr. Elizabeth Buc ("Dr. Buc"), regarding Dr. Buc's testing of Dometic gas absorption refrigerators prior to their 2006 recall. See id. at 217–19, 222–223. Based on these facts, Plaintiffs argue that Dometic failed to meet its burden of showing that Dr. Gray is qualified under *Daubert*. See Plfs.' Post-Hearing Brief [D.E. 542 at 1–2]; *Daubert* Motion [D.E. 395 at 10–11].

However, at the *Daubert* Hearing, Dr. Gray testified that she had used her specialty in thermal fluid sciences, "some of which covers boiler theory and boiler operation", to assist her understanding of the gas-absorption refrigerator technology specific to this case. Id. at 213–14. She also testified that she worked with Dometic engineer, Jim Tierny, and Dometic product specialist, Pat McConnel, to understand how Dometic cooling units, including their boiler tubes, operate; and that she studied Dometic's investigative reports regarding the recalled cooling units to inform her own test experiment of the cooling unit's SBH kit. Id. at 214–15. Dr. Gray also explained that she did not consult the work of Dr. Buc because she was advised that Dr. Buc's initial test documents were privileged, but that even if they were not, they would not have made a difference to her hypothesis that the secondary burner housing was effective at preventing flame spread. Id. at 223–23. Based on these clarifications, the undersigned finds that Dr. Gray is at least minimally qualified under *Daubert*, and that Plaintiffs' qualification arguments speak more to the credibility and weight of Dr. Gray's testimony, rather than admissibility. See Fitzgibbon v. Winnebago Indus., Inc., 2020 WL 1172495, at *2 (S.D. Fla. Jan. 29, 2020) ("[S]o long as the expert is minimally qualified, objections to the level of the expert's expertise [go] to credibility and weight, not admissibility.").

Plaintiffs also challenge Dr. Gray's methodology. Dr. Gray conducted a single experiment that she conceded was based on a "unique set of tests" that were not based on a recognized or established methodology. See 9/13 Tr. [D.E. 535 at 228, 245]. This procedure involved releasing ammonia gas into the refrigerator compartment of an empty cooling unit that Dr. Gray had built, based on the dimensions of a Dometic refrigerator, to ascertain whether the secondary burner housing in a Dometic cooling unit would contain a flame from a leaking boiler tube. Id. at 228–29, 246.

However, the test did not replicate an operating Dometic refrigerator and did not use the same gases (ammonia and hydrogen); the same temperatures (400 degrees Fahrenheit); or the same pressures (350 – 400 p.s.i.) of a Dometic refrigerator. Id. at 228–233, 246–48. Moreover, Dr. Gray used different micron-sized boiler tube leakage holes (635 and 710 microns) from those normally found in a failed Dometic boiler tube (100-200 microns), which, in turn, changed the velocity and flow rate of natural gas passing through corrosion-induced leaks. See id. at 228–31. Dr. Gray testified that she changed the hole size of the boiler tubes in her experiment because "the practicalities of creating a 100-to-200-micron-sized leak in an already filled Dometic refrigerator are difficult", but conceded that Dometic's expert, Dr. Buc, did that exact kind of controlled release testing in her own pre-recall experiment, speculating that Dr. Buc "must have had more time than was available in this case". Id. at 230–31. Additionally, the heat source that Dr. Gray used to test the secondary burner housing was created by lighting a dish of alcohol on fire rather than mimicking the release of hydrogen and ammonia gas that is expelled through the boiler tube of an operating Dometic refrigerator. Id. at 238.

As a result, Dr. Gray's experiment strayed too far from the real-world conditions of a functioning Dometic refrigerator, and her experiment cannot be said to "'fit'" the facts of this case. See McDowell v. Brown, 392 F.3d 1283, 1299 (11th Cir. 2004) (to assist the trier of fact, proffered testimony must "fit" the pertinent facts of the case and "there is no fit where a large analytical leap must be made between the facts and the opinion."). Further, Dr. Gray admitted that her experiment was a first-time experiment that had never been conducted before, had no known error rate, and was not a "standard experiment". Id. at 239, 240, 243–44. These admissions also support a finding that Dr. Gray's experiment fails to meet the reliability standards of *Daubert*. See McDowell, 392 F.3d at 1288 (Daubert's reliability prong requires that the expert's methodology is capable of being

tested, the technique has been subjected to peer review, the method has a known rate of error, and the technique has been generally accepted in the scientific community); see also Dillon v. Sunbelt Rentals, Inc., 464 F.Supp.3d 1333, 1338 (S.D. Fla. 2020) (excluding expert because his analysis seemed "completely separate from those analyses that are reproducible with low to no error rates."). Moreover, Dr. Gray's decision not to invite any other experts to witness her experiment, given its uniqueness and her limited experience in boiler theory, vitiates the reliability of her test results. See 9/13 Tr. [D.E. 535 at 243]; see also Lord v. Fairway Electric Corp., 223 F.Supp.2d 1270, 1282 (M.D. Fla. 2002) ("From the manner in which . . . [the expert conducted] private tests of the equipment outside the presence of Siemens's representatives, to his last-minute conception of a theory of causation, [the expert's] approach to this case has been unconventional to say the least.").

Based on the foregoing considerations, the undersigned concludes that Dr. Gray's Expert Report and the opinions contained therein are not admissible under *Daubert*.

### 2. Ms. Kwon

Plaintiffs argue that Ms. Kwon's expert testimony should be excluded under *Daubert* because: she is not qualified to provide statistical analysis; and her opinions regarding the incident rates of leaks and fires in Dometic cooling units are unreliable. See Plfs.' Post-Hearing Brief [D.E. 542 at 3 – 4]; see also *Daubert* Motion [D.E. 395 at 16–20].

As to Ms. Kwon's qualifications, Plaintiffs argue that she "holds an executive M.B.A." and "is not a statistical expert". See *Daubert* Motion [D.E. 395 at 16–17]. Plaintiffs' Post-Hearing Brief also points to Ms. Kwon's lack of "engineering, statistics, [or] mathematics background". See Plfs.' Post-Hearing Brief [D.E. 542 at 6]. However, Ms. Kwon has "twenty years of experience in preparing and providing expert testimony for financial, economic, and statistical

8

analyses" and "specializes in the application of financial, statistical, and other complex, data-intensive analyses to legal and regulatory issues." See Kwon Expert Report [D.E. 373-16 at 4]. Based on this information, the undersigned finds Ms. Kwon to be qualified to render the foregoing opinions and turns next to Plaintiffs' argument that they are unreliable.

In forming her opinions regarding the incidence of claims related to cooling unit leaks and fires from various populations of Dometic refrigerators, Ms. Kwon analyzed two databases maintained by Dometic: (1) the Safety-Related Fire Claims Database; and (2) the Warranty Claim Database. See Kwon Expert Report [D.E. 373-16 at 6]; 9/14 Tr. [D.E. 531 at 89–90]. According to Ms. Kwon, the Safety-Related Fire Claims Database contained all fire claims allegedly involving property damage and/or personal injury from Dometic refrigerators, while the Warranty Claims Database contained warranty claims filed for Dometic-branded refrigerators. See Ms. Kwon's Expert Report [D.E. 373-16 at 6].

Plaintiffs' challenge the reliability of Ms. Kwon's opinions on the basis that she used an incomplete data set to form her opinions. See Plfs.' Post-Hearing Brief [D.E. 542 at 3–5]; *Daubert* Motion [D.E. 395 at 16–20]. Specifically, Plaintiffs contend that Dometic never maintained complete records of all fire and leaks claims; hence, the Dometic databases Ms. Kwon used to conduct her statistical analyses were "underinclusive", which rendered her results statistically inaccurate. See Plfs.' Post-Hearing Brief [D.E. 542 at 3]; *Daubert* Motion [D.E. 395 at 17]. In response, Defendants argue that Plaintiffs' challenge "does not go to the reliability of Ms. Kwon's methodology but rather that of Dometic's recordkeeping." See Dometic's Opposition to Plaintiffs' *Daubert* Motion (hereafter, "Response Brief") [D.E. 403 at 19 (filed under seal)].

At the *Daubert* Hearing, Ms. Kwon testified that the custodians of the Dometic databases, Chris Jackson ("Mr. Jackson") and Ben White ("Mr. White"), represented to her that both

9

databases included "the entire universe of warranty claims that [Dometic] possessed, as well as all of the safety-related fire claims", which included "all claims that involved personal injury or property damage." See 9/14 Tr. [D.E. 531 at 78, 89]. However, Plaintiffs refute Ms. Kwon's testimony based on deposition testimony of Mr. Jackson in which he stated that the Safety-Related Fire Claims Database was incomplete because he included only fire claims that resulted in significant personal injury or physical damage and did not include claims that resulted in what he deemed to be lesser damage. See Plfs.' Post-Hearing Brief [D.E. 542 at 4]. Plaintiffs also argue that the Warranty Claims Database maintained by Dometic was incomplete because it did not include claims outside of the 2-year warranty period, which would have been reported to third-party RV dealers, and which they contend Ms. Kwon did not attempt to collect. See id. at 4–5. Plaintiffs also dispute the authenticity of the data Ms. Kwon relied on, arguing that Mr. Jackson testified to having never met or spoken to Ms. Kwon, despite her testimony that they had met several times. See id. at 6; 9/14 Tr. [D.E. 531 at 81–84].

Given this conflicting testimony, any dispute regarding the accuracy, completeness, and authenticity of the databases relied upon by Ms. Kwon is best addressed through cross-examination of Ms. Kwon and the presentation of rebuttal witnesses at trial. See generally Daubert, 509 U.S. at 596 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Moreover, courts have held that challenges to the use and accuracy of available data by a statistical expert go to the weight of the expert's testimony, not its admissibility. See, e.g., Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd., 326 F.3d 1333, 1345 (11th Cir. 2003) (the parties' dispute over "the specific numbers" expert put into statistical program went to "the accuracy of

[the expert's] results, not the general scientific validity of his methods."); Hemmings v. Tidyman's Inc., 285 F.3d 1174, 1188 (9th Cir. 2002) ("[I]n most cases, objections to the inadequacies of a study are more appropriately considered an objection going to the weight of the evidence rather than its admissibility."); Hernandez v. Crown Equip. Corp., 92 F.Supp.3d 1325, 1333 (M.D. Ga. 2015) (challenges to the data used in expert's statistical analysis "relate to the accuracy of the information he used in his methodology, not whether the methodology itself was reliable."); Ohio ex rel. Montgomery v. Louis Trauth Dairy, Inc., 925 F.Supp. 1247, 1252–53 (S.D. Ohio 1996) (defendants' argument that experts' testimony should be disqualified because experts' data base was invalid went to "the weight of the testimony, not its admissibility."); In re Chantix (Varenicline) Prod. Liab. Litig., 889 F.Supp.2d 1272, 1280 (N.D. Ala. 2012) (defendant's argument that an expert's opinion was not reliable because he "did not use all of the data available" went "to the weight a jury should afford [the expert's] testimony, and not its admissibility.").

Based on the foregoing considerations, the undersigned finds that Ms. Kwon's Expert Report and the opinions expressed therein are admissible under *Daubert*.

### 3. Dr. Cantor

Plaintiffs argue that the portions of Dr. Cantor's Expert Report that rely on Ms. Kwon's "faulty analysis" should be excluded. See Plfs.' Post-Hearing Brief [D.E. 542 at 9]; see also *Daubert* Motion [D.E. 395 at 24]. Specifically, Plaintiffs argue that Dr. Cantor's conclusion that the safety risk that Dometic's consumer survey expert, Dr. Glasgow, investigated was a "low probability event" is unreliable because it was based exclusively on Ms. Kwon's "incomplete and non-existent data set". Id. However, the foregoing ruling as to Ms. Kwon's Expert Report, moots Plaintiffs' challenge to Dr. Cantor's opinions. See In re Fluidmaster, Inc., Water Connector Components Prod. Liab. Litig., 2017 WL 1196990, at *20 ("[E]xperts may rely on data and other

11

information supplied by third parties."). Accordingly, the undersigned finds that Dr. Cantor's Expert Report and the opinions expressed therein are admissible under *Daubert*.

### 4. Dr. Hanssens

With regard to Dr. Hanssens, Plaintiffs similarly argue that his conclusions should be excluded because he relied on "Ms. Kwon's inadmissible opinions". See Reply [D.E. 406 at 9]; *Daubert* Motion [D.E. 395 at 24]; Plfs.' Post-Hearing Brief [D.E. 542 at 7–8]. However, this argument has been rendered moot by the foregoing ruling regarding Ms. Kwon's Expert Report.

Plaintiffs further argue that Dr. Hanssens' methodologies were unreliable under *Daubert* and that his opinions should be excluded because they are not relevant to the determination of class certification in this case. See Plfs.' Post-Hearing Brief [D.E. 542 at 7–8]; *Daubert* Motion [D.E. 395 at 20–22].

In forming his opinions, Dr. Hanssens conducted two types of consumer surveys: a materiality survey and an exposure survey. See 9/14 Tr. [D.E. 531 at 104, 109]. The materiality survey was designed to test whether a disclosure of the alleged safety risks associated with a Dometic refrigerator would impact consumers' purchasing behavior; while the exposure survey was designed to test what percentage of consumers review written material, such as brochures, before purchasing RVs. See id. at 6–7. For his materiality survey, Dr. Hanssens showed a test group of participants an RV brochure with a disclosure statement related to the fire safety risks of a Dometic refrigerator, while a control group was shown the brochure without the disclosure. See 9/14 Tr. [D.E. 542 at 104, 109]. The fire safety disclosure that was presented in the survey test brochure showed a defect rate of less than one percent, which was based on Ms. Kwon's statistical analyses of leak and fire claims rates. Id. at 113–14. A total of 270 respondents participated in this survey. See Hanssens' Expert Report [D.E. 373-36 at 17]. Based on the materiality survey,

Dr. Hanssens opined that exposure to a realistic disclosure "would not have had a statistically significant effect on most consumers' RV purchasing decisions." Id. at 23–24.

For his exposure survey, Dr. Hanssens conducted an online survey of consumers asking questions about the types of information and materials to which they were exposed before purchasing their RVs. See id. at 14–18. A total of 137 respondents participated in the exposure survey. Id. at 17. Based on the exposure survey, Dr. Hanssens opined that most consumers "would likely not have been exposed to written materials in which a disclosure of the alleged defect at issue could have been made." Id. at 18–22.

Plaintiffs argue that Dr. Hanssens manipulated the test brochure to purposely minimize the attention drawn to the "defect rate" of Dometic refrigerators. See Plfs.' Post-Hearing Brief [D.E. 542 at 8]. Specifically, Plaintiffs point to Dr. Hanssens' removal of the only picture of a refrigerator in the test brochure while keeping other optional RV features, such as radio options, and enlarging other features, such as an optional wood floor. See id.; see also 9/14 Tr. [D.E. 531 at 106]. At the *Daubert* Hearing, Dr. Hanssens explained that he removed the refrigerator from the brochure because consumers "would pay extra for the optional fridge. We wanted to rule that out." See 9/14 Tr. [D.E. 531 at 108]. However, he provided no explanation for why he kept other optional features in the brochure. Thus, respondents in the test group were asked to consider a safety risk disclosure in a brochure about an RV refrigerator that was not even pictured in the brochure. As a result, Dr. Hanssens' survey "failed to present the applicable products in a manner that a consumer would encounter them in the actual marketplace." See Pinnacle Advert. & Mktg. Grp., Inc. v. Pinnacle Advert. & Mktg. Grp., LLC, No. 18-CV-81606-Middlebrooks, 2019 WL 7376782, at *3 (S.D. Fla. Sept. 26, 2019) (finding consumer survey was unreliable because it created an artificial marketplace instead of replicating actual market conditions).

Moreover, at the *Daubert* Hearing, Dr. Hanssens attempted to further justify his removal of the refrigerator from the test brochure to "create some white space, in order to print the disclosure in a way that was readily accessible." See 9/14 Tr. [D.E. 531 at 106]. However, the disclosure was not displayed in the white space from where the picture of the refrigerator was removed, or even displayed on the same page. Instead, the disclosure was featured in a footnote on page 9 of a 16-page brochure with indistinguishable font, and Dr. Hanssens never determined whether participants exposed to the disclosure actually saw it. See id. at 109. Thus, Dr. Hanssens failed to include a realistic disclosure and failed to verify whether respondents even considered the disclosure. Accordingly, his conclusion that exposure to a realistic disclosure "would not have had a statistically significant effect on most consumers' RV purchasing decisions" is methodologically flawed.

Both of Dr. Hanssens' surveys also suffered from small sample sizes. The materiality survey had only 270 respondents while the online exposure survey had only 137 respondents. See Hanssens' Expert Report [D.E. 373-36 at 17]. In conducting a survey, the sample size must be robust to draw any empirical conclusions. See Yellowfin Yachts, Inc. v. Barker Boatworks, LLC, 237 F.Supp.3d 1230, 1240 (M.D. Fla. 2017). Additionally, the surveys had a significant drop-out rate of 3,166 people. See Hanssens' Expert Report [D.E. 373-36 at 16]. Although Dr. Hanssens rationalized this significant drop-out rate as reflective of the "small percentage of households [that] purchase RVs" and maintained that the sample size was "sufficient to draw statistical conclusions about key questions", he failed to address how the significant drop-out rate or the inconsistent responses among respondents impacted the surveys' margin of error. This, combined with the methodological flaws addressed above, undermine the surveys' reliability. See Yellowfin, 237 F.Supp.3d at 1240 (excluding consumer survey as unreliable due to its failure to mirror "the actual

14

marketplace", the small sample size, and the significant drop-out rate).[3]

Based on the foregoing considerations, the undersigned finds that Dr. Hanssens' Expert Report and the opinions expressed therein are not admissible under *Daubert.*

## **CONCLUSION**

In accordance with the undersigned's analysis, it is

ORDERED AND ADJUDGED that Defendant's *Daubert* Motion [D.E. 395] is GRANTED IN PART as to Dr. Gray and Dr. Hanssens and DENIED IN PART as to Ms. Kwon and Dr. Cantor.

DONE AND ORDERED in Chambers at Miami, Florida, this 25th day of March, 2022.

ALICIA M. OTAZO-REYES
UNITED STATES MAGISTRATE JUDGE

cc: United States District Judge Robert N. Scola
 Counsel of Record

---

[3] Given this conclusion, the undersigned need not address Plaintiffs' argument that Dr. Hanssens' opinions are not relevant to the determination of class certification in this case.